State *v.* McCleese

## STATE OF CONNECTICUT *v.* WILLIAM MCCLEESE
## (SC 20081)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to *Miller* v. *Alabama* (567 U.S. 460) and *State* v. *Riley* (315 Conn. 637), the prohibition against cruel and usual punishments in the federal constitution precludes a court from sentencing a juvenile offender to life imprisonment, or its functional equivalent, without the possibility of parole, unless the juvenile offender's age and the hallmarks of adolescence have been considered as mitigating factors in the sentencing determination.

Pursuant further to recent legislation (P.A. 15-84, § 1), a person convicted of a crime or crimes committed while such person was under eighteen years of age who received a total effective sentence of more than ten years prior to or after the effective date of the act becomes eligible for parole after serving 60 percent of his or her sentence, or in the case of sentences of more than fifty years imprisonment, after serving thirty years.

The defendant, who had been convicted of the crimes of murder, conspiracy to commit murder, and assault in the first degree, appealed from the trial court's dismissal of his motion to correct an illegal sentence. The defendant was seventeen years old when he committed the crimes and was sentenced to eighty-five years imprisonment without eligibility for parole. The sentencing court made no express reference to the defendant's youth and the hallmarks of adolescence as mitigating factors when it sentenced him. After the defendant was sentenced, *Miller* and *Riley* were decided, and P.A. 15-84 was enacted. The defendant claimed before the court deciding his motion to correct that, under the federal and state constitutions, his sentence was imposed in an illegal manner because the sentencing court made no express reference to his youth and the hallmarks of adolescence as mitigating factors. The defendant also claimed that the retroactive parole eligibility that he was afforded by P.A. 15-84 did not constitute a remedy for a *Miller* violation under the Connecticut constitution, and, thus, he was entitled to be resentenced in accordance with the dictates of *Miller* and *Riley*. The court ultimately dismissed the defendant's motion to correct as moot after the United States Supreme Court determined in *Montgomery* v. *Louisiana* (136 S. Ct. 718) that *Miller* applied retroactively but that, under the federal constitution, a *Miller* violation could be remedied by extending eligibility for parole to a juvenile offender, which remedy had already been afforded to the defendant by virtue of the passage of P.A. 15-84. On appeal, the defendant claimed that the parole eligibility afforded by P.A. 15-84 did not remedy the *Miller* violation under the Connecticut

State *v.* McCleese

constitution, P.A. 15-84 is unconstitutional under the separation of pow-
ers doctrine embodied in article two of the state constitution and under
the due process clause of the fourteenth amendment to the federal
constitution, and P.A. 15-84 violates the defendant's right to equal protec-
tion under the federal constitution. *Held*:

1. The trial court properly dismissed the defendant's motion to correct an
illegal sentence for lack of subject matter jurisdiction on the basis of
mootness, as the parole eligibility afforded to the defendant under P.A.
15-84 was an adequate remedy for a *Miller* violation, and, accordingly,
the defendant could not prevail on his claim that he was entitled to be
resentenced under the state constitution: upon review of the factors set
forth in *State* v. *Geisler* (222 Conn. 672) for construing the scope and
parameters of the Connecticut constitution, this court declined to con-
clude that those factors compelled a state constitutional rule beyond
what the legislature required in P.A. 15-84, because, although federal
precedent requires special treatment of juveniles who are subject to
harsh punishments, that precedent hinged on the severity of those pun-
ishments, and this court could not dismiss the mitigating effect that the
parole eligibility afforded to juvenile offenders under P.A. 15-84 has in
this context, and the relevant text of the state constitutional provisions
at issue (art. I, §§ 8 and 9), the constitutional history, Connecticut and
sister state precedent, and public policy did not support any enhanced
protection under the state constitution; moreover, this court determined,
after considering, inter alia, the historical development of the punish-
ment of juvenile offenders in Connecticut, recent legislative enactments,
and the laws and practices of other jurisdictions, that the remedy of
parole eligibility for a *Miller* violation does not categorically offend
contemporary standards of decency, and this court, in the exercise of
its independent judgment, concluded that such a remedy comported
with the state constitution.

2. The defendant's claims that P.A. 15-84 is unconstitutional under the separa-
tion of powers doctrine embodied in article two of the Connecticut
constitution and the due process clause of the fourteenth amendment
to the United States constitution were unavailing: the legislature did
not exceed its authority by affording the defendant parole eligibility
pursuant to P.A. 15-84, as the power of sentencing is shared by all three
branches of state government, the power to impose or modify a judgment
of conviction is not synonymous with the power of sentencing, and P.A.
15-84 did not alter the defendant's judgment of conviction but, rather,
retroactively modified the state's sentencing scheme, which falls within
the legislature's power to prescribe and limit punishments for crimes
and does not encroach on the judiciary's power to impose or modify a
sentence; moreover, P.A. 15-84 does not violate the separation of powers
doctrine by impermissibly delegating sentencing power to the Board of
Pardons and Paroles, as the board's power at the parole stage is distinct
from the judiciary's sentencing power; furthermore, although this court
determined that the defendant had inadequately briefed his claim that

State *v.* McCleese

P.A. 15-84 violates the due process clause of the fourteenth amendment, it nevertheless concluded, on the basis of P.A. 15-84 as enacted, that any *Miller* violation had been negated by virtue of the fact that the defendant was afforded parole eligibility under that act.

3. The defendant could not prevail on his claim that P.A. 15-84 violates his right to equal protection under the United States constitution on the ground that juveniles convicted of capital felony are entitled to resentencing under P.A. 15-84 whereas juveniles, such as the defendant, who are convicted of murder, are not: even if this court assumed that each group of juveniles that the defendant identifies are similarly situated, the legislature had a rational basis for treating them differently, as the manner in which mandatory sentences for capital felony and discretionary sentences for murder are imposed is distinct and, thus, might have warranted distinct remedies; moreover, the legislature reasonably could have determined that, because only 4 juveniles were serving mandatory life sentences for capital felony or arson murder, whereas approximately 270 juveniles were serving sentences of longer than ten years for other crimes, resentencing was simply a more feasible task for a smaller group in light of the judicial resources needed to conduct such proceedings, and the legislature potentially could have distinguished between actual life sentences for capital felony and those that are for the functional equivalent of life, including for murder, and determined that the latter, which offer the possibility of geriatric release, was worth granting to even the most culpable offenders, particularly at an advanced age when they would likely pose a much lesser threat to society but would cost the state much more to care for.

(*One justice concurring separately; one justice dissenting*)

Argued October 15, 2018—officially released August 23, 2019*

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, assault in the first degree and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Harper, J.*; verdict and judgment of guilty of murder, conspiracy to commit murder and assault in the first degree, from which the defendant appealed to the Appellate Court, *Bishop*, *McLachlan* and *Dupont*, *Js.*, which affirmed the trial court's judgment; thereafter, the court, *Clifford, J.*, dismissed the defendant's

* August 23, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* McCleese

motion to correct an illegal sentence, and the defendant appealed. *Affirmed.*

*Adele V. Patterson*, senior assistant public defender, with whom was *Beth A. Merkin*, public defender, for the appellant (defendant).

*Melissa Patterson*, deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Matthew A. Weiner* and *Lisa M. D'Angelo*, assistant state's attorneys, for the appellee (state).

*Kim E. Rinehart* filed a brief for the Connecticut Psychiatric Society as amicus curiae.

*Opinion*

D'AURIA, J. Under the federal constitution's prohibition of cruel and unusual punishments, a juvenile offender cannot serve a sentence of imprisonment for life, or its functional equivalent, without the possibility of parole, unless his age and the hallmarks of adolescence have been considered as mitigating factors. *Miller* v. *Alabama*, 567 U.S. 460, 476–77, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 60–61, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, U.S. , 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016); *State* v. *Riley*, 315 Conn. 637, 641, 110 A.3d 1205 (2015), cert. denied, U.S. , 136 S. Ct. 1361, 194 L. Ed. 2d 376 (2016). The defendant, William McCleese, a juvenile offender, was originally serving a sentence of imprisonment for the functional equivalent of his life without the possibility of parole, in violation of this constitutional mandate. Because of subsequent legislation, however, he will be eligible for parole in or about 2033. This appeal requires us to decide whether the legislature may remedy the constitutional violation with parole eligibility. We conclude that it may and has done so.

The following undisputed facts and procedural history, as contained in the record and the Appellate

State *v.* McCleese

Court's decision in the defendant's direct appeal, are relevant to this appeal. The defendant was seventeen years old when he and a partner shot and killed one victim and injured another. *State* v. *McCleese*, 94 Conn. App. 510, 512, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006). In 2003, a jury found the defendant guilty of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of § 53a-54a (a) and General Statutes § 53a-48 (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). Id., 511.

The defendant received a total effective sentence of eighty-five years of imprisonment without eligibility for parole, including sixty years on the conviction of murder. Although the sentencing court, *Harper, J.*, considered other mitigating evidence and mentioned the defendant's youth several times, there is no express reference in the record that it specifically considered youth as a mitigating factor, which, at the time, was not a constitutional requirement. See *Miller* v. *Alabama*, supra, 567 U.S. 460. The Appellate Court affirmed his conviction on direct appeal; *State* v. *McCleese*, supra, 94 Conn. App. 521; and this court denied his petition for certification to appeal from the Appellate Court's judgment. *State* v. *McCleese*, 278 Conn. 908, 899 A.2d 36 (2006).

Subsequently, decisions by the United States Supreme Court, decisions by this court, and enactments by our legislature resulted in changes to the sentencing scheme for juvenile offenders. Those changes will be set forth more fully in this opinion, but a brief summary helps to understand the procedural posture of this case. Specifically, the United States Supreme Court in *Miller* held that the eighth amendment's prohibition on cruel and unusual punishments is violated when a juvenile offender serves a mandatory sentence of life imprisonment without the possibility of parole because it renders "youth (and all that accompanies it) irrelevant to impo-

State *v.* McCleese

sition of that harshest prison sentence'' and ''poses too great a risk of disproportionate punishment.'' *Miller* v. *Alabama*, supra, 567 U.S. 479. Thus, an offender's age and the hallmarks of adolescence must be considered as mitigating factors before a juvenile can serve this particular sentence.[1] This court has interpreted *Miller* to apply not only to mandatory sentences for the literal life of the offender, but also to discretionary sentences and sentences that result in imprisonment for the ''functional equivalent'' of an offender's life. *State* v. *Riley*, supra, 315 Conn. 642, 654; see also *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 72. We also have ruled that *Miller* applies not only prospectively, but retroactively, and also to challenges to sentences on collateral review. *Casiano* v. *Commissioner of Correction*, supra, 71.

To comport with federal constitutional requirements, the legislature passed No. 15-84 of the 2015 Public Acts (P.A. 15-84).[2] In relevant part, the act retroactively provided parole eligibility to juvenile offenders sentenced to more than ten years in prison. See P.A. 15-84, § 1. As a result, the defendant is no longer serving a sentence without the possibility of parole—he will be parole eligible after serving thirty years, when he is about fifty years old.

___

[1] We refer to the offender's age and the hallmarks of adolescence as the *Miller* factors throughout this opinion. Specifically, a court must consider ''immaturity, impetuosity, and failure to appreciate risks and consequences''; the offender's ''family and home environment'' and the offender's inability to extricate himself from that environment; ''the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him''; the offender's ''inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys''; and ''the possibility of rehabilitation . . . .'' (Internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 658, quoting *Miller* v. *Alabama*, supra, 567 U.S. 477–78.

[2] Section 1 of No. 15-84 of the 2015 Public Acts, codified at General Statutes (Supp. 2016) § 54-125a, provides in relevant part: ''(f) (1) . . . [A] person convicted of one or more crimes committed while such person was under eighteen years of age, who is incarcerated on or after October 1, 2015, and who received a definite sentence or total effective sentence of more than

State *v.* McCleese

ten years for such crime or crimes prior to, on or after October 1, 2015, may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which such person is confined, provided (A) if such person is serving a sentence of fifty years or less, such person shall be eligible for parole after serving sixty per cent of the sentence or twelve years, whichever is greater, or (B) if such person is serving a sentence of more than fifty years, such person shall be eligible for parole after serving thirty years. . . .

"(2) The board shall apply the parole eligibility rules of this subsection only with respect to the sentence for a crime or crimes committed while a person was under eighteen years of age. . . .

"(3) Whenever a person becomes eligible for parole release pursuant to this subsection, the board shall hold a hearing to determine such person's suitability for parole release. . . .

"(4) After such hearing, the board may allow such person to go at large on parole . . . if it appears . . . (C) such person has demonstrated substantial rehabilitation since the date such crime or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes.

"(5) After such hearing, the board shall articulate for the record its decision and the reasons for its decision. If the board determines that continued confinement is necessary, the board may reassess such person's suitability for a new parole hearing at a later date to be determined at the discretion of the board, but not earlier than two years after the date of its decision. . . ."

Section 2 of No. 15-84 of the 2015 Public Acts, codified at General Statutes (Supp. 2016) § 54-91g, provides in relevant part: "(a) If the case of a child . . . is transferred to the regular criminal docket of the Superior Court . . . and the child is convicted of a class A or B felony pursuant to such transfer, at the time of sentencing, the court shall:

"(1) Consider, in addition to any other information relevant to sentencing, the defendant's age at the time of the offense, the hallmark features of adolescence, and any scientific and psychological evidence showing the differences between a child's brain development and an adult's brain development; and

"(2) Consider, if the court proposes to sentence the child to a lengthy sentence under which it is likely that the child will die while incarcerated, how the scientific and psychological evidence described in subdivision (1) of this subsection counsels against such a sentence.

"(b) Notwithstanding the provisions of section 54-91a of the general statutes, no presentence investigation or report may be waived with respect to a child convicted of a class A or B felony. . . .

"(d) The Court Support Services Division of the Judicial Branch shall compile reference materials relating to adolescent psychological and brain development to assist courts in sentencing children pursuant to this section."

State *v.* McCleese

Following these developments, the defendant filed a motion to correct an illegal sentence. He asserted a *Miller* claim under the federal constitution and a similar claim under the state constitution.[3] Initially, the trial court, *Clifford, J.*, ruled in the defendant's favor on his federal constitutional claim but reserved ruling on a remedy for the federal violation and on the merits of the state constitutional claim.

Three days after the trial court's initial ruling on the motion to correct an illegal sentence, the United States Supreme Court held that *Miller* applied retroactively. *Montgomery* v. *Louisiana*, U.S. , 136 S. Ct. 718, 732, 193 L. Ed. 2d 599 (2016). In other words, a *Miller* violation existed if a juvenile offender was serving life without parole without the trial court's having considered the *Miller* factors, even if the sentencing took place before *Miller* had been decided. Although this court in *Casiano* had already established that *Miller* applied retroactively, critically, *Montgomery* also made clear that "[*Miller*'s] retroactive effect . . . does not require [s]tates to relitigate sentences, let alone convictions, in every case [in which] a juvenile offender received mandatory life without parole. A [s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Id., 736.

Relying on *Montgomery*, the state filed a motion to reconsider the trial court's ruling granting the defen-

[3] "A *Miller* claim or *Miller* violation refers to the sentencing court's obligation to consider a juvenile's age and circumstances related to age at an individualized sentencing hearing as mitigating factors before imposing a sentence of life imprisonment [or its equivalent] without parole." *State* v. *Delgado*, 323 Conn. 801, 806 n.5, 151 A.3d 345 (2016). The United States Supreme Court relied on similar reasoning to decide *Graham* v. *Florida*, 560 U.S. 48, 75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). "A *Graham* claim or *Graham* violation refers to the sentencing court's obligation to provide a meaningful opportunity for parole to a juvenile [nonhomicide offender] who is sentenced to life imprisonment [or its equivalent, regardless of parole eligibility]." *State* v. *Delgado*, supra, 806 n.5.

State *v.* McCleese

dant's motion to correct an illegal sentence. After briefing and argument, the court granted the motion to reconsider, concluded that the defendant's *Miller* claim was now moot under both the federal and state constitutions, and dismissed the motion to correct an illegal sentence. The defendant appealed from that decision to the Appellate Court. The defendant's appeal was then transferred to this court. See Practice Book § 65-2.

In this appeal, we must decide whether the trial court had subject matter jurisdiction over the defendant's motion to correct an illegal sentence. Subject matter jurisdiction "involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 533, 911 A.2d 712 (2006). The existence of jurisdiction is a question of law, and our review is plenary. Id., 532. A trial court generally has no authority to modify a sentence but retains limited subject matter jurisdiction to correct an illegal sentence or a sentence imposed in an illegal manner. *State* v. *Delgado*, 323 Conn. 801, 809, 151 A.3d 345 (2016). Practice Book § 43-22[4] codifies this common-law rule. Id. Therefore, we must decide "whether the defendant has raised a colorable claim within the scope of Practice Book § 43-22 . . . . In the absence of a colorable claim requiring correction, the trial court has no jurisdiction . . . ." (Citation omitted.) Id., 810.

In the present case, whether the defendant has made out a colorable claim depends on (1) whether the parole eligibility afforded by P.A. 15-84 adequately remedies an unconstitutional sentence under the state constitution, (2) whether, consistent with separation of powers

---

[4] Practice Book § 43-22 provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."

State *v.* McCleese

principles embodied in the Connecticut constitution,[5] the legislature may remedy an unconstitutional sentence that was imposed by the judiciary, and (3) whether P.A. 15-84 violates the defendant's right to equal protection. We hold that the defendant has not made out a colorable claim and that the trial court lacked jurisdiction over his motion.

I

The defendant first claims that the parole eligibility afforded by P.A. 15-84, § 1, does not remedy a *Miller* violation under the Connecticut constitution. Specifically, he argues that a juvenile sentenced to fifty years or more without consideration of the *Miller* factors must be resentenced in accordance with *Miller*, regardless of whether he is eligible for parole. We disagree and conclude that parole eligibility under P.A. 15-84, § 1, is an adequate remedy for a *Miller* violation under our state constitution just as it is under the federal constitution.

This court has not yet addressed this issue. In *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), "we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies. . . . These factors,

[5] Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . ."

State *v.* McCleese

[commonly referred to as the *Geisler* factors and] which we consider in turn, inform our application of the established state constitutional standards—standards that . . . derive from United States Supreme Court precedent concerning the eighth amendment—to the defendant's claims in the present case." (Citations omitted.) *State* v. *Santiago*, 318 Conn. 1, 17–18, 122 A.3d 1 (2015).

A

1

Federal Precedent

It is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor. See *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 408, 119 A.3d 462 (2015). Because the point of departure that the defendant advocates for requires an understanding of the federal jurisprudence on the sentencing of juveniles, we begin with a survey of those precedents.

Federal precedent requires special treatment of juveniles when especially harsh punishments are imposed. The cases justify this treatment, in part, by acknowledging that juveniles are less deserving of criminal punishment and are more capable of change than their adult counterparts. But federal case law also relies on the severity of the punishments at issue in these cases: death and life imprisonment without parole. Precisely because these punishments are irrevocable, they are "disproportionate for the vast majority of juvenile offenders . . . ." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. This rationale does not support similar special treatment of juveniles who are parole eligible, notwithstanding the length of the sentence imposed, because they are afforded the opportunity to "demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." Id.

State *v.* McCleese

The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The cruel and unusual punishments clause has been understood to bar "(1) inherently barbaric punishments; (2) excessive and disproportionate punishments; and (3) arbitrary or discriminatory punishments." *State* v. *Santiago*, supra, 318 Conn. 19. "For the most part, however, the [United States Supreme] Court's precedents consider punishments challenged . . . as disproportionate to the crime. The concept of proportionality is central to the [e]ighth [a]mendment." *Graham* v. *Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). There are two types of proportionality challenges: (1) "challenges to the length of term-of-years sentences given all the circumstances in a particular case," and (2) categorical challenges balancing "the nature of the offense . . . [or] the characteristics of the offender" against a particular type of sentence. Id., 60.

The United States Supreme Court's juvenile sentencing cases have involved categorical proportionality challenges, as does the defendant's claim in this appeal. Therefore, in this context, the court has weighed the characteristics of juvenile offenders against the severity of sentences of death or life imprisonment without parole.

On one hand, the court has considered "the unique aspects of adolescence . . . ." *State* v. *Riley*, supra, 315 Conn. 644–45. It repeatedly has recognized that "children are constitutionally different from adults for purposes of sentencing." *Miller* v. *Alabama*, supra, 567 U.S. 471. Juvenile offenders have "diminished culpability and greater prospects for reform" than their adult counterparts because they are less mature, more vulnerable to external influences like peers, and have character traits that are not yet fully ingrained. Id. These observations "[rest] not only on common sense—on

State *v.* McCleese

what 'any parent knows'—but on science and social science . . . .'' Id. And, none of them is crime specific. Id., 473.

On the other hand, the court has considered the severity of the punishments imposed: death or life imprisonment without parole. Sentence severity is critical to a categorical proportionality analysis. Prior to *Graham*, categorical challenges had been applied only to the death penalty. *Graham* v. *Florida*, supra, 560 U.S. 59; see also *Kennedy* v. *Louisiana*, 554 U.S. 407, 438, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (nonhomicide offenders); *Roper* v. *Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (juvenile offenders); *Atkins* v. *Virginia*, 536 U.S. 304, 318, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (offenders with limited intellectual functioning). For juvenile offenders, however, the court extended categorical challenges to apply to sentences of life imprisonment without parole in certain contexts. *Graham* v. *Florida*, supra, 61. It first banned all sentences of life without parole for juvenile nonhomicide offenders; id., 82; and then the mandatory imposition of sentences of life without parole for juvenile homicide offenders. *Miller* v. *Alabama*, supra, 567 U.S. 465.

*Miller*, in particular, justified the extension of the categorical approach for two reasons, both of which relate to the irrevocability of a life-without-parole punishment. First, the court stated that traditional penological justifications could not warrant a mandatory, irrevocable punishment for a juvenile. Id., 472. Most relevant here, if a sentencing court determines that an offender is incapable of change, then incapacitation and the impossibility of rehabilitation justify his permanent imprisonment. See id., 472–73. But, the court noted, this determination is fundamentally ''at odds with a child's capacity for change,'' so it presents a contradiction when applied to juvenile offenders. Id., 473; see also id., 472–73 (''[d]eciding that a juvenile offender

State *v.* McCleese

forever will be a danger to society would require mak-[ing] a judgment that [he] is incorrigible—but incorrigi-bility is inconsistent with youth'' [internal quotation marks omitted]).

Second, the court ''liken[ed] life-without-parole sentences imposed on juveniles to the death penalty itself.'' Id., 474. The two ''share some characteristics . . . that are shared by no other sentences,'' such as irrevocability by ''[i]mprisoning an offender until he dies . . . .'' (Internal quotation marks omitted.) Id., 474–75. The comparison is even more apt in the juvenile context: a life-without-parole sentence is ''especially harsh'' for juveniles ''because [a juvenile offender] will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender.'' (Internal quotation marks omitted.) Id., 475. Moreover, life imprisonment without parole is the ''harshest possible penalty'' available for a juvenile, after *Roper* barred capital punishment for juveniles. Id., 479. Therefore, the court ''treated [life imprisonment without parole] similarly to that most severe punishment'' by adopting ''a distinctive set of legal rules'' that had been applied only in death penalty cases. Id., 475. These rules required individualized sentencing, thereby ensuring that the most severe punishments were not inevitable but were ''reserved only for the most culpable [juvenile] defendants committing the most serious offenses.'' Id., 476.

But when a juvenile is eligible for parole, the punishment is no longer irrevocable, and, therefore, these rationales no longer apply (or, at least, not nearly with as much force). The first reason collapses if state law permits a juvenile to become parole eligible because the punishment expressly acknowledges that the offender might one day change and reenter society. Similarly, the justification for individualized sentencing—the harshness of a life sentence without parole, which will often

State *v.* McCleese

mean a much longer period of incarceration than an adult will have with the same sentence—weakens considerably when state law provides an offender the chance for early release. A punishment with the possibility of parole is surely less harsh than one without it.

Not only was *Miller*'s reasoning limited to sentences that do not include parole eligibility, but its holding was as well. Id., 479 ("[w]e therefore hold that the [e]ighth [a]mendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders"). In *Montgomery*, the court took the opportunity to reiterate that life-with-parole sentences were constitutional, as it expressly permitted states to remedy *Miller* violations with parole eligibility. "Allowing those offenders [sentenced in violation of *Miller*] to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence . . . . The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736.

In sum, the United States Supreme Court's juvenile sentencing cases rest as much on the diminished moral culpability and enhanced capacity for rehabilitation of a juvenile offender as on the irrevocability of a punishment of death or life imprisonment without parole. To dismiss the effect of parole eligibility—which makes a punishment less severe by affording the opportunity to demonstrate change—would undercut their reasoning entirely.

2

Connecticut Constitutional Text and History

Textually, article first, §§ 8 and 9, of the state constitution establish principles of due process and serve as the basis for Connecticut's prohibition against cruel

State *v.* McCleese

and unusual punishments but provide no insight into
*Miller*. See *State* v. *Santiago*, supra, 318 Conn. 16 ("the
constitution of Connecticut prohibits cruel and unusual
punishments under the auspices of the dual due process
provisions contained in article first, §§ 8 and 9"). The
defendant does not contend, and we have not held, that
the text of these provisions of Connecticut's consti-
tution itself, compared with the text of the federal con-
stitution, suggests any enhanced protection under the
state constitution. Moreover, although neither due pro-
cess provision expressly differentiates between juve-
niles and adults, we draw no conclusion from the fact
that "the framers of the 1818 constitution decided to
embed these traditional [freedoms from cruel and
unusual punishments] in our dual due process clauses
. . . rather than in an express punishments clause."
(Citation omitted.) Id., 39.

Neither does Connecticut's constitutional history
support the defendant's argument. In the early 1800s,
Connecticut accounted for the differences between
juvenile and adult offenders, but in ways plainly distin-
guishable from *Miller*.

One seminal distinction was the availability of the
infancy defense: an offender less than seven years of age
was conclusively presumed incapable of committing a
crime, whereas an offender between the ages of seven
and fourteen was presumed incapable, but the presump-
tion was rebuttable. Offenders older than fourteen were
treated as adults. *In re Tyvonne M.*, 211 Conn. 151, 156,
558 A.2d 661 (1989). Other distinctions were less formal.
Legislative pardons for juveniles were inconsistent but
not uncommon; N. Steenburg, Children and the Crimi-
nal Law in Connecticut, 1635–1855: Changing Percep-
tions of Childhood (2005) p. 189 (from 1810 to 1830,
General Assembly granted nine of twenty petitions for
clemency by juvenile offenders, which was a higher

percentage than granted to adult offenders); see also A. Kean, "The History of the Criminal Liability of Children," 53 Law. Q. Rev. 364, 364–66 (1937) (discussing common-law recognition in England as early as thirteenth century of lesser moral culpability of child offenders and development of tendency to pardon them); and juries even may have hesitated to find juveniles guilty during this era. See N. Steenburg, supra, p. 31 ("[t]he General Assembly heard reports that underage criminals were aware that juries did not want to send them to the state prison"). Eventually, juveniles began to receive special treatment in criminal proceedings beyond the infancy defense, such as the appointment of guardians. Id., pp. 23–24, 186–87. By 1843, the legislature had enacted a discretionary sentencing scheme allowing courts to send offenders under age seventeen to less harsh county facilities instead of the state run prisons mandated for adult offenders. Id., p. 200; see Public Acts 1843, c. 21. And, in 1851, it established a separate reform school to house offenders under age sixteen. N. Steenburg, supra, pp. 204–205; see Public Acts 1851, c. 46.

But these protections did not always apply. The laws in place to protect juveniles at the time of ratification were inconsistently followed in practice. See, e.g., N. Steenburg, supra, p. 192 ("the use of . . . guardians was inconsistent and often ineffective"). And the most significant reforms—discretionary sentencing and a reform school—occurred well after the state constitution had been adopted. Even then, although the location where an offender would serve his sentence could be modified, the duration could not: "Because state sentencing guidelines did not specifically allow consideration of mitigating circumstances, many children served what appeared to be excessively harsh sentences . . . for crimes of youthful disobedience or heedlessness. Judges often had no choice in assigning jail or prison sentences because the General Assembly mandated specific sentences for many crimes." Id., pp. 31–32.

State *v.* McCleese

This meant juveniles often received the same criminal punishments as adults, including life imprisonment at the state's most notorious prison, Newgate, and even death. See W. Bailey, Children Before the Courts in Connecticut (1918) p. 19 ("it was legally possible for a boy barely over [seven] years of age to be committed to Newgate for life"); 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 368 ("[a] boy of eight years of age, has been executed for burning two barns"); V. Streib & L. Sametz, "Executing Female Juveniles," 22 Conn. L. Rev. 3, 13–15 (1989) (describing execution of twelve year old girl in 1786).

Thus, although Connecticut historically acknowledged that juvenile offenders are different from their adult counterparts and developed measures to allow courts to account for the disparity, the measures Connecticut has used are distinguishable from the one required by *Miller*. In the early 1800s, juvenile status appeared to end at an offender's fourteenth birthday. When protections were technically available, they were discretionary, inconsistently applied, or both. And when protections were actually invoked, most addressed criminal liability (e.g., the infancy defense) or criminal procedure (e.g., the appointment of guardians), but not criminal punishment. Even the state's later sentence mitigation reforms were merely permissive and only allowed a court to change the location where a defendant would serve a sentence. Mandatory consideration of age and the hallmarks of adolescence prior to imposing certain punishments on juvenile offenders is a much more recent development. Therefore, Connecticut constitutional history does not support the defendant's argument that only resentencing, and not parole eligibility, can remedy a *Miller* violation.

3

Connecticut Precedent

This court has not yet addressed *Miller* as a matter of substantive state law. Our prior decisions on the

State *v.* McCleese

subject have been limited to procedural state law and federal law. We, therefore, consider these cases as persuasive precedent but conclude that they do not support a rule that requires resentencing for punishments that include parole eligibility.

*Casiano* is the only case in which we have addressed cruel and unusual punishment as it relates specifically to juveniles under state law, as opposed to federal law. In that case, we concluded that *Miller* was a watershed rule of criminal procedure, and, therefore, it applied retroactively to cases arising on collateral review. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69, 71. As the defendant notes, we stated broadly that consideration of the *Miller* factors in sentencing was "implicit in the concept of ordered liberty" and "central to an accurate determination that the sentence imposed is a proportionate one." (Internal quotation marks omitted.) Id., 69. But our interpretation of *Miller* was clearly more limited. We recognized that *Miller* "set forth a presumption that a juvenile offender would not receive a life sentence without parole"; id., 70; and repeatedly recognized that the rule was limited to that "particular punishment." Id., 71.

As a matter of federal law, this court expressly and recently has held that parole eligibility is an adequate remedy for a *Miller* violation. In *State* v. *Delgado*, supra, 323 Conn. 810, the defendant originally had been sentenced without consideration of the *Miller* factors to the functional equivalent of life imprisonment without parole. With the enactment of P.A. 15-84, § 1, however, he became parole eligible. Id. We held that this remedied the constitutional violation: "[U]nder *Miller*, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, without parole. . . . As a result [of P.A. 15-84, § 1], the defendant's sentence no longer falls within the purview of *Miller*, *Riley* and *Casiano*, which require consideration of youth related

State *v.* McCleese

mitigating factors only if the sentencing court imposes a sentence of life *without* parole. . . . *Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . .'' (Citations omitted; emphasis altered.) Id., 811; see also part II of this opinion.

This court also has stated more broadly that *Miller* does not apply to sentences that "lack the severity of the sentences at issue in *Roper*, *Graham* and *Miller*." *State* v. *Taylor G.*, 315 Conn. 734, 744–45, 110 A.3d 338 (2015). In *Taylor G.*, we concluded that a juvenile offender's mandatory total effective sentence of ten years of incarceration followed by three years of special parole did not violate *Miller*. The court emphasized that the punishment was "far less severe" than those at issue in the United States Supreme Court's juvenile punishment cases because it was not "final and irrevocable . . . ." Id. We stated: "Although the deprivation of [a juvenile's] liberty for any amount of time, including a single year, is not insignificant, *Roper*, *Graham* and *Miller* cannot be read to mean that all mandatory deprivations of liberty are of potentially constitutional magnitude." Id., 745.[6]

The defendant notes that this court has twice—in *Riley* and *Casiano*—interpreted *Miller* to apply to punishments that it does not expressly include. Although these cases reflect this court's determination that the phrase "life imprisonment without parole" should be construed beyond its literal meaning, we have applied

---

[6] Our Appellate Court also has declined to apply *Miller* (or a state constitutional analogue) to sentences of less than imprisonment for life, or its functional equivalent, without parole. See *State* v. *Rivera*, 177 Conn. App. 242, 275, 172 A.3d 260 (2017) (mandatory minimum sentence of twenty-five years incarceration did not violate state constitution); *Dumas* v. *Commissioner of Correction*, 168 Conn. App. 130, 140–41, 145 A.3d 355 (sentence of thirty years incarceration did not violate federal constitution), cert. denied, 324 Conn. 901, 151 A.3d 1288 (2016); *State* v. *Logan*, 160 Conn. App. 282, 293, 125 A.3d 581 (2015) (sentence of thirty-one years incarceration did not violate federal constitution), cert. denied, 321 Conn. 906, 135 A.3d 279 (2016).

State *v.* McCleese

*Miller* only to punishments that have a substantially similar practical effect. Thus, the punishments at issue in *Riley* and *Casiano* are distinguishable from punishments that include parole eligibility under P.A. 15-84, § 1.

In the first case, *State* v. *Riley*, supra, 315 Conn. 637, in which we reasoned that *Miller* "logically reaches beyond its core holding," we concluded that it applied to discretionary sentences and to sentences for terms of years that were the "functional equivalent" of a sentence of life without parole. Id., 642, 654. But many of the reasons we cited for why *Miller* should apply to these types of punishments do not apply when the juvenile is parole eligible. For example, we relied on the fact that the defendant's sentence of 100 years imprisonment with the possibility of parole after ninety-four years left him "no possibility of parole before his natural life expires" and ensured that he "would undoubtedly die in prison . . . ." Id., 640, 643 n.2, 660. Parole eligibility after thirty years under P.A. 15-84, § 1, however, contemplates release when most juvenile offenders will be in their late forties, thereby offering a realistic opportunity for a life outside of prison.

Similarly, in *Casiano*, apart from the retroactivity holding described previously, we held that *Miller* applied to a sentence of fifty years imprisonment without the possibility of parole. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79. Although we stated that "the concept of 'life' in *Miller* and *Graham* [was] more [broad] than biological survival"; id., 78; we were ultimately concerned with "the sense of hopelessness" that accompanies a life-without-parole sentence, which "means that good behavior and character improvement are immaterial . . . ." (Internal quotation marks omitted.) Id., 78–79, quoting *Graham* v. *Florida*, supra, 560 U.S. 70. Conversely, parole eligibility offers hope and makes an offender's future conduct relevant.[7]

[7] Although we ordered resentencing in *Riley* and *Casiano*, those decisions predated the enactment of P.A. 15-84. Therefore, courts lacked a mechanism

State *v.* McCleese

Thus, Connecticut precedent indicates only that this court has been willing to interpret *Miller* beyond its literal meaning, but not so far as to require resentencing for punishments that include parole eligibility under P.A. 15-84, § 1.

4

Sibling State Precedent

The defendant argues that sibling state comparisons are not helpful in our analysis because certain aspects of Connecticut's juvenile punishment scheme—most notably, a parole system in which eligibility is based in part on the length of the sentence—are unique to this state. Although Connecticut's parole system appears to be distinct in this respect, we note that our essential holding in *Delgado* that *Miller* does not require resentencing for a punishment that includes parole eligibility is consistent with other jurisdictions. See *State* v. *Delgado*, supra, 323 Conn. 811–12 n.7 (citing jurisdictions); see also, e.g., *Talbert* v. *State*, No. 64486, 2016 WL 562778, *1 (Nev. February 10, 2016) (parole eligibility "within [offender's] lifetime"); *State* v. *Charles*, 892 N.W.2d 915, 920–21 (S.D.) (parole eligibility at age sixty), cert. denied, U.S. , 138 S. Ct. 407, 199 L. Ed. 2d 299 (2017). Similarly, other jurisdictions have held that their state constitutions do not require a court to consider the *Miller* factors before imposing a punishment that includes parole eligibility. E.g., *State* v. *Propps*, 897 N.W.2d 91, 102 (Iowa 2017) (punishment including "realistic and meaningful" parole eligibility); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 673, 1 N.E.3d 270 (2013) (life imprisonment with possibility of parole after thirty-one years); *State* v. *Vang*, 847 N.W.2d 248, 262–63 (Minn. 2014) (life imprisonment with possibility of early release after thirty years).

to grant parole eligibility for those defendants at the time. See *State* v. *Delgado*, supra, 323 Conn. 815–16.

State *v.* McCleese

5

Public Policy

Nor does Connecticut's public policy compel a conclusion that resentencing is the sole remedy for a *Miller* violation. "[O]ur legislature . . . has the primary responsibility for formulating the public policy of our state." *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 435. In both *Riley* and *Casiano*, this court declined to address issues related to the recent constitutional developments in juvenile punishment in deference to the legislature. See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79 ("we have every reason to expect that our decisions in *Riley* and in the present case will prompt our legislature to renew earlier efforts to address the implications of . . . *Graham* and *Miller*"); *State* v. *Riley*, supra, 315 Conn. 662 ("there is every reason to believe that the legislature will take definitive action regarding these issues").

In response, the legislature passed P.A. 15-84. See Proposed Senate Bill No. 796, 2015 Sess. ("Statement of Purpose: [t]o comply with the decisions of the Supreme Court of the United States in *Miller* v. *Alabama* [supra, 567 U.S. 460] and *Graham* v. *Florida* [supra, 560 U.S. 48]"). Section 2 of P.A. 15-84, in relevant part, requires a court to consider the *Miller* factors when imposing certain sentences upon juvenile offenders. The legislature determined, however, that this requirement would not be retroactive. See *State* v. *Delgado*, supra, 323 Conn. 814 and n.9. Therefore, it does not apply to the defendant. Section 1 of P.A. 15-84, however, does apply to him and does provide a remedy. As set forth previously, the legislature provided retroactive parole eligibility to juvenile offenders sentenced to more than ten years in prison.

The defendant and amici cite abundant evidence of the differences between juveniles and adults, which they contend weighs in favor of requiring consideration

333 Conn. 378 OCTOBER, 2019 401

State *v.* McCleese

of the *Miller* factors at sentencing, even retrospectively and in addition to parole eligibility.[8] We are not persuaded. First, our legislature considered this perspective alongside other evidence that weighed against a broader application of P.A. 15-84, § 2, such as public safety,[9] the impact on victims,[10] and feasibility.[11] Second,

---

[8] See Brief of Amici Curiae American Psychological Association et al., *Miller* v. *Alabama*, (U.S. 2012) (Nos. 10-9646 and 10-9647), 2012 WL 174239, *8 ("[a]dolescents are less able to control their impulses; they weigh the risks and rewards of possible conduct differently; and they are less able to envision the future and apprehend the consequences of their actions"); Brief of Amicus Curiae American Bar Association, *Montgomery* v. *Louisiana*, (U.S. 2016) (No. 14-280) p. 24 ("[t]he states' interest in finality, which underpins the general rule of [nonretroactivity], is particularly weak here"); Brief of Amicus Curiae Former Juvenile Court Judges, *Montgomery* v. *Louisiana*, (U.S. 2016) (No. 14-280) pp. 5–6 ("the criminal justice system is equipped to revisit the sentences of juvenile offenders pursuant to this [c]ourt's decision in *Miller*, even when those offenders' cases are no longer on direct review and even when a substantial amount of time has passed since the offense was committed").

[9] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 966, remarks of Senator John A. Kissel ("I appreciate all your efforts in working with the leadership of this committee to help move this issue forward for the betterment of the people of the [s]tate of Connecticut but also making sure that public safety is of paramount and continues to remain as paramount importance for the citizens that we represent").

[10] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., pp. 955–56, remarks of Attorney Robert Farr ("[O]ne of my personal issues here was the treatment of the victim's and the victim's families. And I didn't want to see them revictimized by having this great uncertainty. You can think in the [*Riley*] case where an individual was murdered and a sentence was imposed of 100 years. Nine years later they're now back into court again at a resentencing. . . . And so what we tried to do is—as has been pointed out is give some certainty so that in the [*Riley*] case instead of having to worry about resentencing what would have happened is in [thirty] years, [twenty-one] years from now there will be a parole hearing . . . .").

[11] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 963, remarks of Professor Sarah Russell of Quinnipiac University School of Law ("So different states—California and Delaware have decided people should go through a court system [t]o petition essentially the court for a resentencing rather than do it through a parole board . . . . So it really I think depends on the individual state [and] what structures they have in place. Some states don't even have functioning parole boards and so are relying on their court systems for a second look.").

more broadly, we have recognized that certain policy based aspects of criminal punishment are best left to the legislature. See, e.g., *State* v. *Bell*, 303 Conn. 246, 267, 33 A.3d 167 (2011) ("to the extent that the economic costs of incarceration are a factor in determining an appropriate sentence, they are to be considered not by the sentencing authority but by the legislature when it is enacting sentencing provisions"); see also part II B of this opinion. Third, legislatures from other jurisdictions also have chosen to remedy *Miller* violations with parole eligibility. E.g., Cal. Penal Code § 3051 (b) (4) (Deering Supp. 2018); Nev. Rev. Stat. §§ 176.025 and 213.12135 (2017); Tex. Penal Code Ann. § 12.31 (a) (West 2013); Wyo. Stat. Ann. § 6-10-301 (c) (2013).

Fourth, and finally, both a belated resentencing hearing and a parole hearing can provide a meaningful remedy to this newly declared constitutional violation, although neither is ideal. "Under *Miller*, bear in mind, the inquiry is whether the inmate was seen to be incorrigible when he was sentenced—not whether he has proven corrigible and so can safely be paroled today." *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 744 (Scalia, J., dissenting). As with any factual issue, the passage of time often makes this finding difficult. "For example, [if the defendant waived a presentence investigation report at his original sentencing], a resentencing court would be called on to determine, without the benefit of a presentence investigation conducted at the time of the defendant's conviction, what the defendant's character was . . . years ago when he was sentenced. Without such information, the court would likely need to principally rely upon the defendant's subsequent rehabilitation or lack thereof since his sentencing. . . . Resentencing in such cases would be cumbersome and would in reality be more akin to a parole hearing." *State* v. *Williams-Bey*, 167 Conn. App. 744, 778–79, 144 A.3d 467 (2016), modified in part on other grounds, 173 Conn. App. 64, 164 A.3d 31 (2017), aff'd, 333 Conn. 468,

State *v.* McCleese

A.3d (2019). The same situation arises in the present case because the parties cannot locate the presentence investigation report authored for the defendant's original sentencing in 2003. Although it is "not impossible"; *Songster* v. *Beard*, 201 F. Supp. 3d 639, 641 (E.D. Pa. 2016); even in cases in which only a few years have passed, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 68. Asking sentencing judges to make this determination years after the fact might, in these cases, be asking too much.

The parole board, under P.A. 15-84, § 1, on the other hand, bases its decisions on more recent evidence and more ascertainable outcomes. Although parole and resentencing hearings share many of the same characteristics—e.g., the right to counsel, the offender's right to make a statement and present evidence, each victim's right to make a statement, the availability of expert testimony—the parole board relies more on evidence of actual rehabilitation and focuses more on the offender's ability to succeed outside of prison at the most relevant moment, just before he will, potentially, be released. For example, it considers the probability that he will "remain at liberty without violating the law," the continuing "benefits to [the offender] and society that would result from [the offender's] release," and the offender's "substantial rehabilitation . . . ." P.A. 15-84, § 1, codified at General Statutes (Supp. 2016) § 54-125a (f) (4). It does not overlook the value of the *Miller* factors, though. Alongside these forward-looking factors described previously, the board also considers a juvenile offender's "age and circumstances . . . as of the date of the commission of the crime," "remorse and increased maturity since the date of the commission of the crime," and "efforts to overcome . . . obstacles

State *v.* McCleese

that such person may have faced as a child . . . .'' General Statutes (Supp. 2016) § 54-125a (f) (4).[12] It considers not whether a juvenile is capable of change in the distant future but, rather, from the best possible vantage point, whether he has actually changed.

These considerations highlight a truth about the retroactive application of *Miller* that appears to animate the dissent and its frustration with our decisions in this case and in *Delgado*—that no remedy will put the defendant in the same position he would have been in if his youth had been considered when he was sentenced. In the present case, the defendant was effectively sentenced to life imprisonment, and state law did not provide an opportunity for parole for such crimes. See footnote 17 of this opinion. A sentence of life without parole improperly denies the juvenile offender of ''a chance to demonstrate growth and maturity''

---

[12] See footnote 23 of this opinion (comparing *Miller* factors and parole eligibility factors). The dissent incorrectly states that parole eligibility under P.A. 15-84 does not require the board to give any special weight to the *Miller* factors and the diminished culpability of juvenile offenders but, rather, only permits the board to consider the *Miller* factors in determining rehabilitation. Public Act 15-84, § 1, requires the board to consider whether an inmate has demonstrated substantial rehabilitation, considering factors such as ''the age and circumstances of such person *as of the date of the commission of the crime* . . . .'' (Emphasis added.) The fact that the defendant's age at the time of the crime is a factor in determining whether he has demonstrated substantial rehabilitation shows that this factor is not only '' 'future focused,' '' as the dissent contends, but also considers whether he had diminished capacity because of his age at the time of the crime. Just because his age at the time of the crime may be considered for rehabilitative purposes does not mean it cannot also be considered for culpability purposes. If there is any doubt about this, let us clear it up: the board should, *for culpability purposes*, consider the defendant's age and circumstances as of the date of the commission of the crime. This is in line with the parole board's stated policy of giving ''great weight to the diminished culpabilities of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity that has been displayed when considering an offender for suitability.'' State of Connecticut Board of Pardons and Paroles, Annual Report 2016–2017 (2017), available at https://portal.ct.gov/-/media/BOPP/ Legacy-Files/BoPPAnnualReport20162017forDASDigestpdf.pdf (last visited August 23, 2019).

State *v.* McCleese

because the court's judgment that he is "incorrigible" "was made at the outset," before he had the opportunity to show any capacity for change. (Internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 648, quoting *Graham* v. *Florida*, supra, 560 U.S. 73. Without the possibility of parole, the defendant was denied hope; *Graham* v. *Florida*, supra, 70; and had no incentive to "demonstrate growth and maturity" that he might use in support of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *State* v. *Riley*, supra, 648.

Neither the remedy this state provides (parole eligibility), which *Montgomery* has held to be constitutionally sufficient, nor the dissent's proposed remedy of resentencing can reinstate to the defendant the opportunities for demonstrated growth that he lost during those years. That is not to say that resentencing is not a meaningful, practical, and constitutionally sufficient remedy. All we are saying is that parole eligibility also is a meaningful, practical, and constitutionally sufficient remedy in light of the fact that no remedy can travel back in time and provide the defendant with a *Miller* compliant sentencing hearing at the time of his original sentencing. No one has lost their courage, shrugged their shoulders, or not tried to remedy the constitutional violation at issue. Rather, the legislature, this court in *Delgado*, and the United States Supreme Court in *Montgomery* recognized that remedying this violation is not as simple as recalculating a sentence on the basis of retroactive changes to sentencing guidelines or vacating a sentence enhancement that has been deemed unconstitutionally vague, analogies that the dissent finds apt. Unlike those circumstances, the remedy of resentencing in this case is an incomplete remedy. The legislature chose to rectify this problem by providing juvenile defendants with the possibility of parole, a meaningful remedy consistent with *Miller* that "ensures that juve-

State *v.* McCleese

niles whose crime reflected only transient immaturity—
and who have since matured—will not be forced to
serve a disproportionate sentence.'' *Montgomery* v. *Lou-
isiana*, supra, 136 S. Ct. 736.

We acknowledge that a defendant's parole eligibility
date under P.A. 15-84, § 1, is determined by the length
of his original sentence, which, in some cases, was
imposed without consideration of the *Miller* factors.
See P.A. 15-84, § 1, codified at General Statutes (Supp.
2016) § 54-125a (f) (1) (juvenile offender parole eligible
[A] ''if such person is serving a sentence of [between
ten and fifty years] . . . after serving sixty per cent of
the sentence or twelve years, whichever is greater, or
[B] if such person is serving a sentence of more than
fifty years . . . after serving thirty years''). But this
alone does not completely nullify the significance of
parole eligibility under P.A. 15-84, § 1. See *Graham* v.
*Florida*, supra, 560 U.S. 75 (''[a] [s]tate is not required
to guarantee eventual freedom to a juvenile offender'').
It still offers a meaningful opportunity to ''demonstrate
the truth of *Miller*'s central intuition—that children who
commit even heinous crimes are capable of change.''
*Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736.

Ultimately, we do not believe that we are better situ-
ated than the legislature to strike an appropriate bal-
ance among these competing policies, particularly in
an area that is traditionally within the purview of the
legislature and when we have called the legislature's
attention to these specific issues. Therefore, we do not
conclude that the considerations identified by the
defendant and the amici compel a particular constitu-
tional rule beyond what the legislature requires.

B

The preceding *Geisler* analysis informs our applica-
tion of the substantive legal test under our state consti-
tution. See *State* v. *Santiago*, supra, 318 Conn. 18–19
n.14. (''our consideration of the relevant *Geisler* factors

State *v.* McCleese

is interwoven into our application of the legal framework that properly governs such challenges"). "[T]he constitution of Connecticut prohibits cruel and unusual punishments under the auspices of the dual due process provisions contained in article first, §§ 8 and 9." Id., 16. In evaluating challenges under this prohibition, we apply the two part federal framework that we adopted in *State* v. *Ross*, 230 Conn. 183, 252, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). *State* v. *Santiago*, supra, 19, 21. First, we consider "whether the punishment at issue comports with contemporary standards of decency." Id., 21. Second, we also must exercise our independent judgment to determine whether the punishment is constitutional. Id., 22.

In the first part—evolving standards of decency—we look for consensus based on five objective criteria: "(1) the historical development of the punishment at issue; (2) legislative enactments; (3) the current practice of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions; and (5) the opinions and recommendations of professional associations." Id., 52.

We conclude that it does not categorically offend contemporary standards of decency to remedy a *Miller* violation with parole eligibility. Historically, although Connecticut enacted some measures to permit courts to mitigate punishment of juvenile offenders, the specific protections used were distinguishable from the sentencing practice at issue, limited, and inconsistently applied. See part I A 2 of this opinion. Currently, the prospective-only sentencing provisions in P.A. 15-84, § 2, reflect the reasoned judgment of the legislature, which is a reliable indicator of our public policy. This approach to *Miller* violations is also in accord with that of other jurisdictions. Finally, although a consensus of professional associations[13] agrees that the *Miller* factors are relevant in determining a juvenile offender's culpability and

---

[13] See footnote 8 of this opinion.

capacity for rehabilitation, we note that P.A. 15-84, § 2, instructs a parole board to consider similar factors, as well as any additional evidence put forth by the offender, in determining whether the offender is entitled to early release.

In the second part of the federal framework—the exercise of independent judgment—we consider judicial precedents and "our own understanding of the rights secured by the constitution," which encompasses "whether the penalty at issue promotes any of the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation." *State* v. *Santiago*, supra, 318 Conn. 22. Although "this court cannot abdicate its nondelegable responsibility for the adjudication of constitutional rights" by giving unwarranted deference to the legislature, "we should exercise our authority with great restraint . . . ." (Internal quotation marks omitted.) Id., 42, quoting *State* v. *Ross*, supra, 230 Conn. 249.

Our independent judgment does not compel a conclusion that a *Miller* violation may not be remedied by parole eligibility under P.A. 15-84, § 1. Like the federal constitution, our state constitution secures the right to proportionality in the punishment of juveniles. In analyzing proportionality, the characteristics of the offender must be balanced against the severity of the punishment. Thus, in juvenile sentencing cases, courts have emphasized the severity of the sentences at issue —death and life without parole—as much as the diminished culpability and greater capacity for reform of juvenile offenders. Moreover, as distinguished from sentences of death and life without parole, sentences contemplating early release do not necessarily negate all penological justification. Incapacitation and rehabilitation may continue to justify sentences with parole eligibility because they account for the fact that juveniles can change.

State *v.* McCleese

For the previously stated reasons, we conclude that parole eligibility afforded by P.A. 15-84, § 1, is an adequate remedy for a *Miller* violation under the Connecticut constitution.

II

In *State* v. *Delgado*, supra, 323 Conn. 801, we held that in light of P.A. 15-84, which provided juvenile offenders with the possibility of parole, *Miller* no longer applied because it did not apply to juvenile offenders who are serving a sentence of life imprisonment, or its equivalent, as long as those offenders have the possibility of parole. Id., 811; see also *State* v. *Boyd*, 323 Conn. 816, 151 A.3d 355 (2016) (companion case to *Delgado* decided on same grounds). The defendant claims that this court should overrule *Delgado* because it renders P.A. 15-84, § 1, unconstitutional under the separation of powers doctrine embodied in the state constitution and under the due process clause of the federal constitution. See footnote 15 of this opinion. Addressing these arguments now, we are not persuaded by them.

A

In *Delgado*, the defendant originally was serving a sentence of sixty-five years in prison, "which is equivalent to life imprisonment," and was not eligible for parole. *State* v. *Delgado*, supra, 323 Conn. 810. Because the sentencing court had not considered the *Miller* factors, the defendant filed a motion to correct an illegal sentence, asserting a *Miller* claim under the federal constitution. Id., 803–805. In that motion, he claimed he was entitled to resentencing, despite the subsequent passage of P.A. 15-84, § 1, which afforded him the possibility of parole. Id., 803–804.

This court disagreed. It reasoned that because of P.A. 15-84, § 1, the defendant "can no longer claim that he is serving a sentence of life imprisonment, or its equiva-

State *v.* McCleese

lent, without parole. The eighth amendment, as interpreted by *Miller*, does not prohibit a court from imposing a sentence of life imprisonment with the opportunity for parole for a juvenile homicide offender, nor does it require the court to consider the mitigating factors of youth before imposing such a sentence. . . . Rather, under *Miller*, a sentencing court's obligation to consider youth related mitigating factors is limited to cases in which the court imposes a sentence of life, or its equivalent, without parole. . . . As a result, the defendant's sentence *no longer falls within the purview of Miller*, *Riley* and *Casiano*, which require consideration of youth related mitigating factors only if the sentencing court imposes a sentence of life without parole. . . . *Miller simply does not apply* when a juvenile's sentence provides an opportunity for parole . . . .'' (Citations omitted; emphasis altered.) Id., 810–11.

We noted in *Delgado* that our reasoning was consistent with the analysis in *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736, which indicated that states ''may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. . . . Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the [e]ighth [a]mendment.'' (Citation omitted.) Id.

The dissent takes issue with our reliance on *Delgado*, which it contends improperly interpreted *Montgomery* by holding that *Miller* no longer applied once the defendant was granted parole eligibility. The dissent argues that this sidesteps the issue of whether parole eligibility is a sufficient cure for a federal *Miller* violation in light of this court's holding in *Casiano* that the rule in *Miller* is a watershed rule of criminal procedure. The dissent essentially would have us overrule *Delgado* on this

State *v.* McCleese

ground.[14] The dissent argues further that *Delgado* is distinguishable on the ground that it "neither addresses nor answers the different question raised by defendant here, which is whether the availability of parole under P.A. 15-84 cures a constitutional violation that this court [in *Casiano*] has deemed to be a 'watershed' rule—that is, a rule essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty—as a matter of state postconviction, remedial law." (Emphasis omitted.)

The defendant never has advanced any of the dissent's arguments, however.[15] Moreover, the arguments

---

[14] The dissent, itself, never uses the words "overrule" or "wrongly decided" in relation to *Delgado*. Instead, it contends that "the majority's reliance" on *Delgado* is erroneous. Nevertheless, overruling *Delgado* must be the dissent's argument, although that can be divined only from what the dissent goes on to say is "mistake[n]" about *Delgado*.

[15] To be clear, the defendant never has argued that *Delgado* should be overruled or distinguished because either (1) *Delgado* misinterprets *Montgomery* by holding that parole eligibility negates any *Miller* violation rather than cures an existing violation, or (2) parole eligibility under P.A. 15-84 fails to cure a *Miller* violation under the federal constitution as a matter of state postconviction remedial law in light of *Casiano*.

The defendant filed his initial brief prior to this court's decision in *Delgado*. In it, he argued that parole eligibility under P.A. 15-84 did not remedy a *Miller* violation because the requirements of *Miller* could be satisfied only by resentencing. As to *Montgomery*, the defendant argued that it did not overrule this court's holding in *Casiano* that *Miller* was a watershed rule of criminal procedure, and, as such, any violation could be corrected only by resentencing. The defendant asserted separation of powers and due process claims. After this court's decision in *Delgado* was released, however, the defendant sought and received permission to file a supplemental brief, in which he conceded that *Delgado* precluded his federal *Miller* claim, although he maintained his separation of powers and due process claims, and asserted a new equal protection claim. Subsequently, in his reply brief, for the first time, the defendant argued that this court should reconsider and overrule *Delgado*, relying not on the reasoning used by the dissent but, rather, by arguing that *Delgado* violates the separation of powers doctrine embodied in article two of the state constitution, as amended by article eighteen of the amendments. In light of the fact that *Delgado* was released after the defendant filed his initial brief, we have addressed all of the claims that the defendant has raised not only in his supplemental brief but also in

State *v.* McCleese

the dissent raises not only implicate whether *Delgado* should be overruled, but also call into question the continued vitality of *Casiano* and the proper application of the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), after the United States Supreme Court subsequently held in *Montgomery* that the rule in *Miller* was a matter of "substantive" law.[16] *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. Because the parties do not address these issues, and in light of the unique nature of *Casiano*— the only case to hold that *Miller* is a watershed rule of criminal procedure, a unique designation in of itself, and a linchpin of the dissent's analysis—this court has been provided with little guidance on how to address these issues. It is precisely for this reason that we do not decide cases based on issues not raised by the parties. See, e.g., *State* v. *Connor*, 321 Conn. 350, 362, 138 A.3d 265 (2016).

Additionally, when no party has asked us to overrule precedent, we are particularly reluctant to address—

his reply brief, including his claim that *Delgado* should be overruled on the ground that it violates the separation of powers doctrine. We, however, do not address the dissent's contention that *Delgado* should be overruled because it misinterprets *Montgomery* and misapplies *Casiano*. The claim raised by the defendant involves the separation of powers doctrine, whereas the dissent's contention involves cruel and unusual punishment. Although both seek to overturn *Delgado*, we disagree with the dissent that these legal issues are intertwined or subsumed with the issues raised.

[16] The retroactivity outcome is the same regardless of whether it is a substantive or watershed procedural rule. As the dissent correctly points out, the framework set forth in *Teague* for determining whether a federal constitutional rule applies retroactively may be applied in a "more expansive" manner by a state than by the United States Supreme Court "where a particular state interest is better served by a broader retroactivity ruling." (Internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 64. This court in *Casiano*, however, did not necessarily apply the *Teague* framework more liberally than the court in *Montgomery* did. Both courts determined that the rule in *Miller* was retroactive but on different grounds. Surely, the United States Supreme Court's interpretation of its own precedent—as a substantive or procedural watershed—would be helpful even to a state's application of the *Teague* framework.

333 Conn. 378 OCTOBER, 2019 413

State *v.* McCleese

much less disturb—a unanimous precedent of recent vintage; see, e.g., *New England Estates*, *LLC* v. *Branford*, 294 Conn. 817, 836 n.20, 988 A.2d 229 (2010) (declining to overrule precedent when not argued by parties); when the legislative response to *Miller* at issue was invited by this court; see *State* v. *Casiano*, supra, 317 Conn. 79 ("we have every reason to expect that our decisions in *Riley* and in the present case will prompt our legislature to renew earlier efforts to address the implications of the Supreme Court's decisions in *Graham* and *Miller*"); and the precedent is consistent with the United States Supreme Court's holding that parole eligibility is a sufficient remedy for a *Miller* violation. See *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. We would reexamine such a precedent only when there is a "special justification . . . ." *Sepega* v. *DeLaura*, 326 Conn. 788, 799 n.5, 167 A.3d 916 (2017). The dissent's views do not present such a justification.

B

With respect to the claims actually raised by the defendant, he requests that we overrule our holding in *Delgado* because, otherwise, in his view, it effectively renders P.A. 15-84, § 1, unconstitutional by violating the separation of powers doctrine embodied in article second of the Connecticut constitution, as amended by article eighteen of the amendments. See footnote 5 of this opinion. According to the defendant, *Delgado* holds that his unconstitutional punishment is cured by P.A. 15-84, § 1, because it provides him with a future parole hearing, at which a panel of the Board of Pardons and Paroles will consider the *Miller* factors. He argues that the legislature overstepped and encroached upon the power of the judiciary by changing the defendant's sentence to include the possibility of parole and by delegating resentencing power to the board because sentencing is solely within the power of the judiciary.

State *v.* McCleese

Our holding in *Delgado*, however, was not that P.A. 15-84, § 1, *cures* a *Miller* violation. Rather, more accurately, parole eligibility under P.A. 15-84, § 1, *negates* a *Miller* violation because the sentence no longer falls within the purview of *Miller*. Resentencing would undoubtedly cure a *Miller* violation. See *State* v. *Delgado*, supra, 323 Conn. 810–11. But, although a particular defendant's sentence is not actually changed per court order, P.A. 15-84, § 1, has the legal effect of altering the defendant's punishment so that he no longer will serve life, or its equivalent, in prison without the possibility of parole. And, as we said in *Delgado*, if a defendant has the possibility of parole, there is no *Miller* violation. Id. Thus, resentencing is not required. Id. A punishment that includes parole eligibility "no longer falls within the purview of *Miller* . . . . *Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . ." (Citations omitted.) Id., 811. As we have more recently stated, "we understand *Delgado* to be, in essence, a mootness decision . . . ." *State* v. *Evans*, 329 Conn. 770, 788 n.16, 189 A.3d 1184 (2018), cert. denied, U.S. , 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019). It is with this understanding that we address the defendant's separation of powers argument, which does not persuade us.

"[B]ecause a validly enacted statute carries with it a strong presumption of constitutionality, those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . [W]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) Id., 809.

Article second of the constitution of Connecticut, as amended by article eighteen of the amendments, provides in relevant part: "The powers of government shall be divided into three distinct departments, and

333 Conn. 378 OCTOBER, 2019 415

State *v.* McCleese

each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. . . .'' Conn. Const., amend XVIII. ''[T]he primary purpose of [the separation of powers] doctrine is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers.'' (Internal quotation marks omitted.) *State* v. *Evans*, supra, 329 Conn. 810. Nevertheless, ''[t]he rule of separation of governmental powers cannot always be rigidly applied.'' (Internal quotation marks omitted.) *Adams* v. *Rubinow*, 157 Conn. 150, 155, 251 A.2d 49 (1968). Our state government is not ''divided in any such way that all acts of the nature of the functions of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government.'' *In re Application of Clark*, 65 Conn. 17, 38, 31 A. 522 (1894).

In challenges to a statute's constitutionality on the ground that it impermissibly infringes on the judicial authority in violation of separation of powers principles, ''[a] statute will be held unconstitutional on [separation of powers] grounds [only] if: (1) it governs subject matter that not only falls within the judicial power, but also lies exclusively within judicial control; or (2) it significantly interferes with the orderly functioning of the Superior Court's judicial role.'' (Internal quotation marks omitted.) *State* v. *Evans*, supra, 329 Conn. 810.

1

The defendant first argues that the legislature impermissibly modified his sentence by providing him with parole eligibility. He argues that, insofar as the judiciary

State *v.* McCleese

has the exclusive power to modify a judgment, it also has the exclusive power to modify a sentence because a sentence is "the pronouncement of judgment in criminal cases  . . . ." This argument is unpersuasive for two reasons.

First, under our state's law, the power of sentencing is a shared power. Although the judiciary exclusively has the power to render, open, vacate, or modify a judgment, we repeatedly have held that the power to sentence is shared by all three branches of government. See, e.g., *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 828, 950 A.2d 1220 (2008) ("[a]lthough the judiciary unquestionably has power over criminal sentencing . . . the judiciary *does not have exclusive authority in that area*" [emphasis in original; internal quotation marks omitted]); id. (legislature decides appropriate penalties, judiciary adjudicates and determines sentence, and executive manages parole system); *State* v. *Campbell*, 224 Conn. 168, 178, 617 A.2d 889 (1992) ("sentencing is not within the exclusive control of the judiciary and . . . there is no constitutional requirement that courts be given discretion in imposing sentences"), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993). The judiciary may impose a specific sentence, but the legislature has the power to define crimes, prescribe punishments for crimes, impose mandatory minimum terms of imprisonment for certain crimes, preclude the probation or suspension of a sentence, and even pardon offenders. See *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976) ("the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment and to the judiciary the power to try offenses under these laws and impose punishment within the limits and according to the methods therein provided"); *State* v. *Morrison*, 39 Conn. App. 632, 634, 665 A.2d 1372 ("Prescribing punishments for crimes . . . is . . . a function of the legislature. . . . The

State *v.* McCleese

judiciary's power to impose specific types of sentences is therefore defined by the legislature." [Citations omitted; internal quotation marks omitted.]), cert. denied, 235 Conn. 939, 668 A.2d 376 (1995); see also *McLaughlin* v. *Bronson*, 206 Conn. 267, 271, 537 A.2d 1004 (1988) ("Ordinarily, the pardoning power resides in the executive. . . . In Connecticut, the pardoning power is vested in the legislature . . . ." [Citations omitted.]). It is the legislature that defines the parameters of a sentencing scheme, including whether it permits parole eligibility.[17] See *Mead* v. *Commissioner of Correction*, 282 Conn. 317, 324, 920 A.2d 301 (2007) ("eligibility for parole [is] a part of the state's sentencing scheme"). That is what the legislature did in enacting P.A. 15-84, § 1.[18]

Second, the power to impose or modify a judgment of conviction is not synonymous with the power of sen-

---

[17] As a matter of fact, the reason that the defendant's original sentence violated *Miller* was because General Statutes § 54-125a (b) (1) denied the defendant the possibility of parole. See General Statutes (Rev. to 2001) § 54-125a (b) (1) ("[n]o person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole: . . . murder, as provided in section 53a-54a").

Although the trial court had discretion to determine the length of the defendant's sentence, it did not have discretion to grant the defendant the possibility of parole. Thus, by providing the possibility of parole through the enactment of P.A. 15-84, the legislature did not usurp the trial court's exercise of discretion to determine whether the defendant was parole eligible but, rather, modified the sentencing scheme responsible for the defendant's unconstitutional sentence.

[18] The legislature did not change the length of the defendant's sentence but, rather, provided him with the possibility of parole. The defendant conceded at oral argument—and thus we assume without deciding—that if, post-*Miller*, all defendants must be resentenced, it is possible that a particular defendant could be sentenced to a longer period of incarceration than he originally received. P.A. 15-84, § 1, on the other hand, ensures that juvenile defendants with a sentence of more than ten years of incarceration, who did not have the benefit of *Miller* at the time of sentencing, would have their sentences mitigated, and potentially spend less time incarcerated, by providing the possibility of parole. See *State* v. *Campbell*, supra, 224 Conn. 178 ("it [is] proper to construe broadly a remedial statute designed to curb the ill effects stemming from wide judicial discretion in sentencing prisoners for similar offenses" [internal quotation marks omitted]).

State *v.* McCleese

tencing. A judgment of conviction is defined as "[t]he written record of a criminal judgment, consisting of the plea, the verdict or findings, the adjudication, and the sentence." Black's Law Dictionary (10th Ed. 2014) p. 972. "Sentencing," however, is defined as "[t]he judicial determination of the penalty for a crime." Id., p. 1570; see id., p. 1569 (defining "sentence" as "the punishment imposed on a criminal wrongdoer"). Public Act 15-84, § 1, does not alter the defendant's judgment of conviction. He remains convicted of murder, conspiracy to commit murder, and assault in the first degree. In enacting P.A. 15-84, § 1, the legislature retroactively modified the sentencing scheme (although not any particular sentence), which is included in its power to prescribe and limit punishments for crimes.[19]

The defendant counters that, although the legislature has the power to create the scheme of punishment, it cannot do so retroactively without violating the separation of powers doctrine because the change effectively modifies his sentence. But the fact that the legislature, in exercising its power to create and modify the state's sentencing scheme, has affected a particular defendant's sentence does not mean that it has impermissibly encroached upon the judiciary's powers to impose or modify a sentence. It is well established that judicial and legislative powers necessarily overlap in many areas,

---

[19] Our analysis accords with other jurisdictions that have held that the legislature does not intrude on the realm of the judiciary by retroactively changing a sentencing scheme to create more lenient penalty provisions. See *State ex rel. Esteen* v. *State*, 239 So. 3d 233, 237 (La. 2018) ("[T]he legislature exercised its exclusive authority to determine the length of punishment for crimes classified as felonies, and further declared those more lenient penalties shall be applied retroactively to those already sentenced. Nothing in the constitution prohibits the legislature from enacting more lenient penalty provisions and declaring they be applied retroactively in the interest of fairness in sentencing."); see also *State* v. *Vera*, 235 Ariz. 571, 576–77, 334 P.3d 754 (App. 2014) (legislature did not violate separation of powers by providing defendant with possibility of parole after sentencing), review denied, Arizona Supreme Court (March 17, 2015), cert. denied, U.S. , 136 S. Ct. 121, 193 L. Ed. 2d 95 (2015).

State *v.* McCleese

including sentencing. See, e.g., *State* v. *Campbell*, supra, 224 Conn. 178 ("[a]lthough the judiciary unquestionably has power over criminal sentencing . . . the judiciary does not have exclusive authority in that area").

The fact that certain governmental powers overlap is not only necessary to ensure the smooth and effective operation of government; see *In re Application of Clark*, supra, 65 Conn. 38 (rigid application of separation of powers doctrine would "result in the paralysis of government"); but also is a product of the historical evolution of Connecticut's governmental system, which established a "tradition of harmony" among the separate branches of government that the separate branches of the federal governmental system did not have. R. Kay, "The Rule-Making Authority and Separation of Powers in Connecticut," 8 Conn. L. Rev. 1, 7 (1975). As it relates to the Judicial Branch, this tradition might be explained in part by the fact that, before the constitution of 1818, Connecticut did not have a separate judicial system. Rather, the executive and legislative branches shared judicial power, with the governor sitting on the five judge panel of the Superior Court and the General Assembly having the power of final review over decisions. W. Horton, The History of the Connecticut Supreme Court (West 2008) pp. 9–12.

Nor was a strict separation of powers enshrined in the state constitution. Although delegates adopted the provision currently contained in article second, they rejected another provision that would have barred one branch of government from exercising the powers of another:[20] "[T]he [1818 state constitutional] convention [did] not seem to have been interested either in a partic-

___

[20] The rejected provision provides: "No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances herein after expressly directed or permitted." Journal of the Proceedings of the Convention of Delegates Convened at Hartford, August 26, 1818 (1901) p. 78; see *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 604, 37 A. 1080 (1897) (*Baldwin, J.*, dissenting).

State *v.* McCleese

ularly stringent version of separation of powers or in a careful restriction of the powers of the legislature. The convention struck the provision that would have expressly prohibited the officers of each department from exercising powers properly classified as belonging to another. Such explicit provisions were common in constitutions of other states being written at this time. . . . Given [the] tradition of harmony between executive and legislative departments, it may be that the convention did not feel the necessity for a strict expression of separation of powers. . . . The 1818 Constitution thus established a government with a flexible separation of powers and a distinctly dominant legislative branch.'' R. Kay, supra, 8 Conn. L. Rev. 7.

''The Connecticut history with regard to separation of powers stands in marked contrast, therefore, to that of the federal [c]onstitution.'' E. Peters, ''Getting Away from the Federal Paradigm: Separation of Powers in State Courts,'' 81 Minn. L. Rev. 1543, 1552 (1997). ''Diverse [state] histories[21] demonstrate that even though state constitutional provisions may textually resemble those found in the federal [c]onstitution, they may reflect distinct state identities that will result in differences in how courts apply and construe such texts. Far from being arbitrary departures from a superior federal model, these interpretations have the legitimacy of

___

[21] For example, unlike Connecticut, ''Massachusetts had a . . . colonial heritage, colored by numerous perceived injustices at the hands of various royal mandates. Not surprisingly, revolutionary political leaders drafting the Massachusetts Constitution of 1780 provided expressly for the separation of powers. Other states, including Maryland, New Hampshire, North Carolina, and Virginia, did likewise.'' (Footnotes omitted.) E. Peters, supra, 81 Minn. L. Rev. 1552–53; see also, e.g., Mass. Const., pt. 1, art. XXX (''[i]n the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them'').

State *v.* McCleese

differences rooted in the past and adaptable for the future.'' (Footnote added.) Id., 1553.

This is not to say that one branch cannot unconstitutionally intrude upon the authority of another branch, or has not done so. This court is appropriately vigilant in guarding against such intrusions. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 512, 811 A.2d 667 (2002) (legislative intrusion on judiciary); *Savage* v. *Aronson*, 214 Conn. 256, 269, 571 A.2d 696 (1990) (executive intrusion on judiciary); *Stolberg* v. *Caldwell*, 175 Conn. 586, 604, 402 A.2d 763 (1978) (executive intrusion on legislature), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981); see also *Spiotti* v. *Wolcott*, 326 Conn. 190, 201–202, 163 A.3d 46 (2017) (''[w]hen we construe a statute . . . our only responsibility is to determine what the legislature, within constitutional limits, intended to do'' [internal quotation marks omitted]).

In the present circumstances, however, the original constitutional intrusion was not upon another branch, but upon the rights of individuals not to have cruel and unusual punishments imposed upon them. Those punishments, although judicially levied, were legislatively authorized or even, in some cases, mandated. It is hardly incongruous—or unconstitutional—then, for the legislature to be a part of the solution to the intrusion on individual liberty it caused. This seems particularly true when the United States Supreme Court has suggested this very remedy; see *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736; and when we have invited the legislature to take such action. See *State* v. *Riley*, supra, 315 Conn. 662; see also *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79.

Accordingly, we conclude that P.A. 15-84, § 1, is not unconstitutional because the legislature did not improp-

State *v.* McCleese

erly exceed its authority by providing the defendant with the possibility of parole.[22]

2

The defendant also argues that, in its quest to cure a *Miller* violation via the parole board's future consideration of the *Miller* factors, P.A. 15-84, § 1, violates the separation of powers doctrine by impermissibly delegating sentencing authority to the board. This argument is premised on a misreading of *Delgado* and the act.

To reiterate, in *Delgado*, we held that after passage of P.A. 15-84, § 1, if a sentence includes parole eligibility, it "no longer falls within the purview of *Miller* . . . . *Miller* simply does not apply . . . ." (Citations omitted.) *State* v. *Delgado*, 323 Conn. 811. Thus, as men-

---

[22] Rather than implicating separation of powers issues, by retroactively modifying the sentencing scheme, P.A. 15-84, § 1, presents the possibility of an ex post facto issue. However, because P.A. 15-84, § 1, does not increase the length of time that the defendant will be incarcerated but, rather, provides for the possibility that he will be released on parole sooner than the expiration of his sentence, P.A. 15-84, § 1, does not present any ex post facto concerns. See *Johnson* v. *Commissioner of Correction*, 258 Conn. 804, 818, 786 A.2d 1091 (2002) ("[T]he primary focus of an ex post facto claim is the probability of increased punishment. . . . [T]he new law [must] [create] a genuine risk that [an individual] will be incarcerated longer under that new law than under the old law."); see also *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 377, 163 A.3d 597 (2017) (amendments to parole eligibility statute did not give rise to ex post facto issue because "the challenged parole hearing provision does not increase the petitioner's overall sentence, alter his initial parole eligibility date, or change the standard used by the [B]oard [of Pardons and Paroles] to determine parole suitability").

We note, however, that should the legislature amend or repeal P.A. 15-84, § 1, possible ex post facto issues might arise. See *Petaway* v. *Commissioner of Correction*, 160 Conn. App. 727, 733, 125 A.3d 1053 (2015) (if there is change in law affecting parole eligibility, such change violates ex post facto clause if change "extend[s] the length of [a defendant's] incarceration or delay[s] the date of his first eligibility for parole consideration beyond the time periods in existence at the time of his criminal conduct"), cert. dismissed, 324 Conn. 912, 153 A.3d 1288 (2017). Under those circumstances, criminal defendants possibly could file a motion to correct an illegal sentence or a petition for a writ of habeas corpus.

State *v.* McCleese

tioned before, we did not hold in *Delgado* that P.A. 15-84, § 1, cures a *Miller* violation. Rather, more accurately, parole eligibility under P.A. 15-84, § 1, negates a *Miller* violation. As a result, because the defendant is parole eligible under the act, he is not entitled to have the *Miller* factors considered, and, thus, there is no need for resentencing. Therefore, the board's power at the parole stage is distinct from the judiciary's sentencing power.

Instead, the board has the power to determine whether a parole eligible offender is entitled to parole. This is to ensure that defendants have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham* v. *Florida*, supra, 560 U.S. 75. In furtherance of this goal, the act requires the board to consider certain factors, including the offender's age and circumstances at the time of the offense. But, although these factors echo the *Miller* factors, they are not identical.[23] Even if they were, just because the constitution requires the *Miller* factors to be considered at sentencing going forward does not mean that the legislature may not also require that the board consider those factors at other times.

[23] Compare footnote 1 of this opinion (reciting *Miller* factors), with P.A. 15-84, § 1, codified at General Statutes (Supp. 2016) § 54-125a (f) (4) ("the board may allow such person to go at large on parole . . . if it appears . . . [C] such person has demonstrated substantial rehabilitation since the date such crime or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes").

State *v.* McCleese

Therefore, we conclude that P.A. 15-84, § 1, does not violate the separation of powers doctrine by improperly delegating sentencing power to the board.

C

In his reply brief, the defendant also claims that we should overrule *Delgado* because it renders P.A. 15-84, § 1, unconstitutional by violating federal due process requirements. Specifically, he argues that, because the legislature has the power to change or repeal P.A. 15-84, § 1, in the future, he is deprived of due process in light of the rule that " '[s]entences in criminal cases should reveal with fair certainty the intent of the court and exclude any serious misapprehensions by those who must execute them.' *United States* v. *Daugherty*, 269 U.S. 360, 363, 46 S. Ct. 156, 70 L. Ed. 309 (1926)." He argues that his sentence is not fairly certain if the legislature has the power to continually change it.

The defendant's analysis of this claim consists of one short paragraph in his reply brief. He does not provide any case law or analysis beyond his single citation to *Daugherty*. Nor does he specify whether he is making a procedural or substantive due process claim. There is no reference to the interest balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), as required under a procedural due process claim that implicates a liberty interest; see *State* v. *Anderson*, 319 Conn. 288, 314–15, 127 A.3d 100 (2015); or to the rational basis test applied to a substantive due process claim that does not involve a fundamental right. See *State* v. *Moran*, 264 Conn. 593, 615, 825 A.2d 111 (2003).

Because the defendant has not briefed the analytic complexities of his due process claim, we deem it inadequately briefed. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 726–29, 138 A.3d 868 (2016) (upholding determination that due process claim was inadequately briefed). Nevertheless, we emphasize that our holdings in *Delgado*

State *v.* McCleese

and the present case are premised on P.A. 15-84, § 1, as enacted. It is on the basis of this legislation that we hold that any *Miller* violation has been negated and that there are no separation of powers violations. See also footnote 22 of this opinion.

### III

Finally, the defendant claims that P.A. 15-84, § 1, violates his right to equal protection under the federal constitution.[24] He argues that, as a juvenile convicted of murder, he is entitled to resentencing because, pursuant to P.A. 15-84, § 6, a juvenile convicted of capital felony, in violation of General Statutes § 53a-54b,[25] is entitled to resentencing. See footnote 26 of this opinion. We are not persuaded.

The defendant's argument proceeds in three parts. First, he contends that, as a juvenile convicted of murder with a discretionary sixty year sentence, he is similarly situated to another type of juvenile offender— one who has been convicted of capital felony with a mandatory life sentence, but without an underlying sentence for murder (which is a lesser included offense of capital felony). See *State* v. *Reynolds*, 264 Conn. 1, 24 n.13, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Second, he argues that these groups are treated differently under

[24] The defendant's constitutional claim was not raised before the trial court. To the extent that the record supports it, we nonetheless review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The defendant also cites the Connecticut constitution as a basis for his equal protection claim but provides no separate discussion. Therefore, we limit our analysis to the federal constitution. See, e.g., *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 382 and n.10, 163 A.3d 597 (2017).

[25] Section 53a-54b was amended by No. 12-5, § 1, of the 2012 Public Acts to substitute "murder with special circumstances" for "capital felony." *State* v. *Medina*, 170 Conn. App. 609, 610 n.1, 155 A.3d 285, cert. denied, 325 Conn. 914, 159 A.3d 231 (2017). We refer to § 53a-54 as "capital felony" for convenience and because that is the nomenclature employed by the parties and the trial court.

State *v.* McCleese

P.A. 15-84. Under § 1 of the act, a juvenile murderer is parole eligible, but under § 6,[26] he contends, a juvenile capital felony offender's conviction may be vacated. Therefore, because the capital felony offender then lacks a conviction (and sentence), his conviction for murder is revived, he receives a new sentencing proceeding for murder, and he becomes parole eligible as a result of § 1. In other words, the murderer receives only a parole hearing, whereas the capital felony offender receives both a second sentencing *and* a parole hearing. Third, he argues that this scheme is irrational because, regardless of the length of the resulting sentence, permitting a second sentencing proceeding and parole eligibility constitutes a less severe punishment than parole eligibility alone. Because capital felony is a crime that is more severe than murder, the defendant contends, no rational basis can support denying a juvenile convicted of murder the second sentencing proceeding that is provided to a juvenile convicted of capital felony. See *State* v. *Moran*, supra, 264 Conn. 614 ("it [is] impossible to conceive of a rational basis to support treating the less serious crime more severely than the more serious crime"). We disagree that the statutory scheme is irrational.

[26] Section 6 of P.A. 15-84 applies only to sentencing—not convictions—and, therefore, does not appear to support the defendant's argument. Public Act No. 15-84, § 6, codified at General Statutes (Supp. 2016) § 53a-46a (a), provides in relevant part: "A person shall be subjected to the penalty of death for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b, as amended by this act, in effect prior to April 25, 2012, only if (1) a hearing is held in accordance with the provisions of this section, and (2) such person was eighteen years of age or older at the time the offense was committed."

Rather, the defendant's argument appears to be based on P.A. 15-84, § 7, codified at General Statutes (Supp. 2016) § 53a-54b, which provides in relevant part: "A person is guilty of [capital felony] who is convicted of any of the following *and was eighteen years of age or older at the time of the offense* . . . ." (Emphasis in language added by P.A. 15-84, § 7.) The legislature specified that the amendment was retroactively "applicable to any person convicted prior to, on or after" October 1, 2015, the effective date of P.A. 15-84, § 7. We note that, shortly after the legislature's approval of P.A. 15-84, the court abolished the death penalty in *State* v. *Santiago*, supra, 318 Conn. 140.

State *v.* McCleese

Even if we assume that the juvenile offenders the defendant identifies are similarly situated,[27] the legislature had a rational basis for treating them differently. "If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 383, 163 A.3d 597 (2017). Under rational basis review, "[i]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . [The law] must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (Citation omitted; internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 406, 13 A.3d 1089 (2011). "[T]he [statutory scheme] is presumed constitutional . . . and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *State* v. *Moran*, supra, 264 Conn. 606.[28]

---

[27] The defendant argues that the classes of juvenile offenders he identifies are similarly situated because murder is a lesser included offense of capital felony. The state points out, however, that they are distinguishable because one sentence is discretionary and the other is mandatory. Although perhaps a sufficient distinction, we nonetheless assume, without deciding, that the offenders are similarly situated for equal protection purposes.

We note one further issue with regard to the defendant's argument that a capital felony offender will be "resentence[d] . . . ." A capital felony offender is not "resentenced" in the same way that the defendant claims he is entitled to be. Rather, a conviction and sentence for one crime (capital felony) are vacated and a sentence for a separate conviction (murder) is imposed. Conversely, the defendant wants to have a second sentencing for the same conviction (murder).

[28] The defendant argues that intermediate scrutiny applies to his claim because it involves "a significant interference with liberty . . . ." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 161, 957 A.2d 407 (2008). We have rejected similar arguments before and have applied rational basis scrutiny to claims involving interference with liberty as a result of criminal punishment. E.g., *State* v. *Higgins*, 265 Conn. 35, 66, 826 A.2d 1126 (2003); *State* v. *Wright*, 246 Conn. 132, 140–41, 716 A.2d 870 (1998).

State *v.* McCleese

The manner in which mandatory sentences for capital felony and discretionary sentences for murder were imposed is distinct and, thus, they conceivably might have warranted distinct remedies. Specifically, a juvenile convicted of murder already had received an opportunity to make his case for leniency to a judge, whereas a juvenile convicted of capital felony had not. In this sense, offering resentencing only to the latter group would result in equal, not harsher, punishment, at least in a numerical sense—each group gets one chance to convince a judge to exercise discretion in its favor. Moreover, practical considerations potentially might have made drawing this distinction between the groups rational. Only 4 juveniles were serving mandatory life sentences for capital felony or arson murder, as compared to approximately 270 juveniles serving sentences of longer than ten years for other crimes.[29] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1062, remarks of Sarah Eagan, Office of the Child Advocate (stating number of juveniles sentenced). Because of the judicial resources needed to conduct the proceedings, the legislature reasonably could have determined that resentencing was simply a more feasible task for a smaller group. We also note that the legislature potentially could have distinguished between actual life sentences (for capital felony) and those that are for the functional equivalent of life (for murder). Because the latter still offer the possibility of geriatric release, the legislature could have determined that this possibility was worth granting to even the most culpable offenders, particularly at an advanced age

---

[29] Although his assertion is not in the record, the defendant claims that forty juvenile offenders were serving sentences of more than fifty years as of November, 2014. Testimony before the Judiciary Committee regarding juvenile sentencing shows that, as of March 4, 2015, "[a]pproximately [fifty] people [were] serving [a] sentence of [fifty] years or more for crimes committed under [the] age [of eighteen], most without the chance of parole." (Emphasis omitted.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1062, remarks of Sarah Eagan, Office of the Child Advocate.

State *v.* McCleese

when they would likely pose a much lesser threat to society but would cost the state much more to care for. Any of these reasons suffice to pass constitutional muster.

For the previously discussed reasons, the defendant is not entitled to relief in connection with his equal protection claim.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, McDONALD, MULLINS and KAHN, Js., concurred.

PALMER, J., concurring. I agree with and therefore join the majority opinion. I write separately only to note that, as I read the opinion of the dissenting justice, that opinion seems to be predicated on principles of fundamental fairness. These principles are violated, the dissenting justice suggests, when a juvenile is sentenced to life in prison or its functional equivalent—even if the juvenile is later afforded the opportunity for parole in satisfaction of the requirements of the eighth amendment—if the sentencing judge did not expressly consider the mitigating factors of youth. Those principles, however, are not so much rooted in the eighth amendment but, rather, in the due process clauses of the federal and state constitutions. Because the defendant, William McCleese, has not raised any such due process claim, we must await another day to address it.

ECKER, J., dissenting. Only four years ago, this court decided—as a matter of state law—that the constitutional requirement of an individualized sentencing proceeding for juvenile offenders facing life sentences established a ''watershed'' rule of criminal procedure. *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 69–70, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, U.S. , 136 S. Ct. 1364, 194

State *v.* McCleese

L. Ed. 2d 376 (2016). Our holding in *Casiano* was expressed in these emphatic terms: "If failing to consider youth and its attendant characteristics creates a risk of disproportionate punishment in violation of the eighth amendment, then the rule in *Miller* [v. *Alabama*, 567 U.S. 460, 479, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)], assuredly implicates the fundamental fairness of a juvenile sentencing proceeding because it is a 'basic precept of justice' that punishment must be proportionate 'to both the offender and the offense.' (Internal quotation marks omitted.) Id., 469. The court in *Miller* also 'alter[ed] our understanding of the bedrock procedural elements essential to the fairness of a [juvenile sentencing] proceeding'; (emphasis omitted; internal quotation marks omitted) *Sawyer* v. *Smith*, [497 U.S. 227, 242, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990)]; because the court required that certain factors be considered in an individualized sentencing proceeding before a certain class of offenders may receive a particular punishment. In other words, our understanding of the bedrock procedural element of individualized sentencing was altered when the court intertwined two strands of its eighth amendment jurisprudence to require consideration of new factors for a class of offenders to create a presumption against a particular punishment. As one court aptly noted, albeit in dicta: '[I]f ever there was a legal rule that should—as a matter of law and morality—be given retroactive effect, it is the rule announced in *Miller*. To hold otherwise would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice.' (Emphasis omitted.) *Hill* v. *Snyder*, Docket No. 10-14568, 2013 WL 364198, \*2 (E.D. Mich. January 30, 2013)." *Casiano* v. *Commissioner of Correction*, supra, 70–71.

These are very strong words, and I have quoted them accurately. In *Casiano*, we determined, "as a matter of law and morality," as a "basic precept of justice," and

State *v.* McCleese

as a "bedrock procedural [element] essential to the fairness of a [juvenile sentencing] proceeding," that *before* a trial court exercises its discretion to sentence a juvenile offender to a lifetime in prison, the court must consider the mitigating effects of youth and its attendant circumstances. (Internal quotation marks omitted.) Id., 71. Indeed, we deemed this legal and moral principle so fundamental to our jurisprudence in Connecticut—so deeply " 'implicit in the concept of ordered liberty' "; id., 69, quoting *Teague* v. *Lane*, 489 U.S. 288, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)—that we chose to characterize it as a "watershed" rule, a designation of such singular status that the United States Supreme Court itself has yet to affix to any of its own decisions.[1] When *Casiano* was issued, moreover, we were acutely aware that such a designation would require retroactive application of the underlying procedural rule, i.e., the *Miller* requirement of an individualized sentencing hearing at which the sentencing judge would consider the hallmarks of youth before passing judgment on a juvenile offender facing the possibility of receiving the harshest of sentences. "To hold otherwise," this court stated, "would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice." (Internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 71.

Today, four short years later, we accept just such a miscarriage of justice visited on the defendant, William McCleese, and the majority justifies the result as if *Casiano*, and another case decided a few months earlier, *State* v. *Riley*, 315 Conn. 637, 110 A.3d 1205 (2015), cert. denied,      U.S.    , 136 S. Ct. 1361, 194 L. Ed.

---

[1] The watershed label, which triggers retroactive application of the new rule, describes an "extremely narrow" class of cases arising so rarely that the United States Supreme Court itself "has never held that any rule falls within the exception." (Internal quotation marks omitted.) *Lester* v. *United States*, 921 F.3d 1306, 1308 (11th Cir. 2019).

State *v.* McCleese

2d 376 (2016), did not mean what they said. I am unable
to understand how this court can overlook *Casiano*
and *Riley* without any apparent sign of cognitive disso-
nance, or why it would choose to do so. I respect-
fully dissent.

For the reasons set forth in this dissenting opinion,
I disagree that the parole eligibility conferred by No.
15-84 of the 2015 Public Acts (P.A. 15-84)[2] provides an

[2] Section 1 of No. 15-84 of the 2015 Public Acts, codified at General Statutes
§ 54-125a, provides in relevant part: "(f) (1) Notwithstanding the provisions
of subsections (a) to (e), inclusive, of this section, a person convicted of
one or more crimes committed while such person was under eighteen years
of age, who is incarcerated on or after October 1, 2015, and who received
a definite sentence or total effective sentence of more than ten years for
such crime or crimes prior to, on or after October 1, 2015, may be allowed
to go at large on parole in the discretion of the panel of the Board of Pardons
and Paroles for the institution in which such person is confined, provided
(A) if such person is serving a sentence of fifty years or less, such person
shall be eligible for parole after serving sixty per cent of the sentence or
twelve years, whichever is greater, or (B) if such person is serving a sentence
of more than fifty years, such person shall be eligible for parole after serving
thirty years. Nothing in this subsection shall limit a person's eligibility for
parole release under the provisions of subsections (a) to (e), inclusive, of
this section if such person would be eligible for parole release at an earlier
date under any of such provisions.

"(2) The board shall apply the parole eligibility rules of this subsection
only with respect to the sentence for a crime or crimes committed while a
person was under eighteen years of age. . . .

"(3) Whenever a person becomes eligible for parole release pursuant to
this subsection, the board shall hold a hearing to determine such person's
suitability for parole release. . . .

"(4) After such hearing, the board may allow such person to go at large
on parole with respect to any portion of a sentence that was based on a
crime or crimes committed while such person was under eighteen years of
age if the board finds that such parole release would be consistent with the
factors set forth in subdivisions (1) to (4), inclusive, of subsection (c) of
section 54-300 and if it appears, from all available information, including,
but not limited to, any reports from the Commissioner of Correction, that
(A) there is a reasonable probability that such person will live and remain
at liberty without violating the law, (B) the benefits to such person and
society that would result from such person's release to community supervi-
sion substantially outweigh the benefits to such person and society that
would result from such person's continued incarceration, and (C) such
person has demonstrated substantial rehabilitation since the date such crime

333 Conn. 378 OCTOBER, 2019 433

*State* v. *McCleese*

adequate remedy for the constitutional violation that occurred at the time of the defendant's sentencing. The trial court failed to conduct an individualized sentencing hearing at which it properly considered the hallmarks of youth—and, in particular, the diminished moral culpability of the juvenile defendant, which *must* be taken into account before imposing an eighty-five year sentence pursuant to *Miller*. The defendant continues to serve the eighty-five year sentence unconstitutionally imposed on him by that judicial authority. This means not only that the judiciary previously failed to meet our constitutional obligation in connection with the performance of our core function, which is to provide individualized justice, but that we persist in doing so.

I

A

It is today undeniable that "children are constitutionally different from adults for purposes of sentencing."

or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes.

"(5) After such hearing, the board shall articulate for the record its decision and the reasons for its decision. If the board determines that continued confinement is necessary, the board may reassess such person's suitability for a new parole hearing at a later date to be determined at the discretion of the board, but not earlier than two years after the date of its decision.

"(6) The decision of the board under this subsection shall not be subject to appeal. . . ."

State *v.* McCleese

*Miller* v. *Alabama*, supra, 567 U.S. 471; see id. (stating that this principle was "establish[ed]" by *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005], and *Graham* v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 [2010]). The driving force behind this extraordinary[3] pronouncement, and the reason for the broad consensus around it, is the ever growing body of scientific evidence demonstrating that children have biological and psychological differences that make them substantially less able than adults to control their impulses, exercise self-control, resist peer pressure, consider alternative courses of conduct, and appreciate the long-term consequences of their actions. See *Miller*

---

[3] Extraordinary only in America, I should add. It is no point of pride that we are one of only one or two countries in the world that permits a juvenile offender to be sentenced to life without parole. See C. de la Vega & M. Leighton, "Sentencing Our Children to Die in Prison: Global Law and Practice," 42 U.S.F. L. Rev. 983, 985 (2008) (engaging in comparative analysis of juvenile justice and rehabilitation models). "These issues have become so [well understood] at the international level," explain the authors of this article, "that a state's execution of [the life without parole] sentence raises the possibility that it not only violates juvenile justice standards but also contravenes international norms established by the United Nations Convention Against Torture. Globally, the consensus against imposing [life without parole] sentences on children is virtually universal. Based on the authors' research, there is only one country in the world today [as of 2008] that continues to sentence child offenders to [life without parole] terms: the United States." (Footnote omitted.) Id., 985. A different source indicates that one other country shares this dubious distinction, at least as of 2005. That country is Somalia. See Amnesty International, Human Rights Watch, "The Rest of Their Lives: Life Without Parole for Child Offenders in the United States," (2005), p. 5, available at http://www.hrw.org/sites/default/files/reports/TheRestofTheirLives.pdf (last visited August 22, 2019) ("all countries except the United States and Somalia have ratified the Convention on the Rights of the Child, which explicitly forbids 'life imprisonment without possibility of release' for 'offenses committed by persons below eighteen years of age' "). It appears that our system of justice, in some ways a model envied and emulated around the globe, lags behind the vast majority of other countries with respect to our treatment of juvenile offenders. And if Nelson Mandela spoke the truth when he said that "[t]here can be no keener revelation of a society's soul than the way in which it treats its children," then our failure to keep pace with practices elsewhere in this regard should be viewed as profoundly disturbing.

State *v.* McCleese

v. *Alabama*, supra, 472 n.5.[4] These findings are understood to have inescapable and meaningful *moral* significance, because they mean that children are less morally blameworthy—less culpable, we say—for their actions, "even when they commit terrible crimes." Id., 472. For this reason, the findings hold powerful implications for the law of juvenile sentencing.

The time is fast approaching, in my opinion, when we must acknowledge that the constitutional implications of this idea—that children are constitutionally different for the purposes of criminal sentencing—extend beyond the minimalist holding settled on by the majority, which appears to derive from it nothing more than a formalistic rule prohibiting the imposition of a sentence of death or life without parole on juvenile defendants. I believe that the rationale expressed in the

[4] In *Roper*, *Graham*, and *Miller*, the United States Supreme Court relied on this growing body of scientific and social science evidence to establish the constitutionally significant differences between adults and juveniles. See *Miller* v. *Alabama*, supra, 567 U.S. 472 n.5 ("[t]he evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger"). Children are different, the court explained, in significant part because their brains are not yet fully developed or fully functioning. See *Graham* v. *Florida*, supra, 560 U.S. 68 (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"). The various anatomical structures and neurochemical systems that govern decision making and impulse control not only remain undeveloped in adolescents, but develop at different rates within the brain, and this developmental mismatch is responsible for some of the most significant impairments, such as impulsivity and lack of judgment and self-control, so often observed in juveniles. See *Miller* v. *Alabama*, supra, 472 n.5. The American Psychiatric Association (APA) submitted an amicus curiae brief in *Miller* providing an extensive review of the science and social science demonstrating these points. Id. (quoting APA's amicus brief for proposition that " '[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance' "). In the present case, a similar brief was filed by amicus curiae Connecticut Psychiatric Society, which focused on the post-*Miller* literature further establishing the scientific basis for treating children differently from adults for the purposes of criminal sentencing.

State *v.* McCleese

relevant cases, and especially this court's own decisions in *Riley* and *Casiano*, obligates us to find significantly greater meaning in the underlying principles than that found by the majority.

B

It is important to provide the relevant backdrop to this appeal because these facts illustrate in living color the nature and extent of the constitutional violation that occurred when the defendant was sentenced to an eighty-five year term of imprisonment in June, 2003. The particular details of the sentencing proceedings explain why I refuse to accept the view that the defendant's sentence does not remain stained by the constitutional violation under review.

The defendant was sentenced to an eighty-five year term of imprisonment for crimes he committed at the age of seventeen.[5] The state has conceded that the sentencing proceeding was not compliant with *Miller*,[6] and

[5] The defendant was convicted in 2003 of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (5), after he and his younger half brother shot and killed the victim and injured another individual in 2001. *State* v. *McCleese*, 94 Conn. App. 510, 511–12, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006). The defendant "conspired to murder [the victim] . . . because the defendant believed that [the victim] was 'messing with' [his younger brother]." Id., 512. The trial court imposed a sixty year sentence on the murder count, a consecutive twenty year sentence on the conspiracy count, and a consecutive five year sentence on the assault count, resulting in a total effective sentence of eighty-five years.

[6] At the hearing on the defendant's motion to correct an illegal sentence, the trial court asked the state if it was disputed that the sentencing judge "[did not] follow the mandates of *Miller* v. *Alabama* in what should be considered by a judge when sentencing [a juvenile offender] . . . [i]n other words . . . the [sentencing] court did not factor in all the things that *Miller* v. *Alabama* now requires?" The state answered: "Correct. . . . [T]hose factors were not taken into consideration." This clarifying colloquy followed:

"The Court: I mean, I'm not saying that the [judge] did not mention at some point, you know, which normally they do in sentencing, the youth of somebody, but . . . the sentencing [judge] didn't address in the detail and form in which *Miller* v. *Alabama* requires is what—

"[The Prosecutor]: That is correct, Your Honor. . . . Age may have been mentioned, but not in any detail as required under those cases."

State *v.* McCleese

the trial court presiding over the defendant's motion to correct an illegal sentence found that the sentencing court "clearly did not consider the [defendant's] age, youthful attributes and capacity for reform and rehabilitation as delineated in *Miller* . . . ." Indeed, without the benefit of the *Roper*, *Graham*, and *Miller* trilogy, the sentencing court considered the defendant's age, not as a mitigating factor lessening his culpability, but as an aggravating factor *confirming* the court's view of the defendant's incorrigibility.[7] After mentioning the defendant's use of marijuana since the age of fourteen, his daily use of the drug "illy" for one year, his negligible employment history, and that he dropped out of high school in the ninth grade, the court stated that it did not "view these factors . . . as acceptable excuses or mitigation for [his] serious criminal conduct." To the contrary, the court stated: "*If anything, these factors heighten the court's concern for you and your future.*" (Emphasis added.) Consistent with this theme, the court continued: "Furthermore, this court is not unmindful that, arguably, you do not possess an extensive criminal record. However, this fact gives the court little comfort in view of the nature and extent of your criminal activities and felony conviction, *especially when those factors are considered in light of your young age.*" (Emphasis added.)

The trial court sentenced the defendant to a lifetime behind bars in language that depicts the defendant as the fully mature, fully culpable author of his own fate, whose deadly actions were the product of his own unimpaired free choice: "You know, Mr. McCleese, a major part of life is the making of choices. You had the opportunity to freely choose the road you wished to travel.

---

[7] No fault is attributable to the sentencing court here. As I previously noted, the sentencing proceeding took place in 2003, nine years before *Miller* and twelve years before this court decided *Riley*. There is no evidence in the record that the defendant at sentencing submitted or referenced any of the scientific studies or raised any legal claim on the basis of those studies.

State *v.* McCleese

You had the opportunity to plan your life's journey and you made your choice. You chose to travel a path that resulted in the wounding of one man, the death of another, and the destruction of your own life. Consequently, your journey as a free man, as a free, young man living in a free society, has come to an end. You have forfeited your societal rights to go and come as you [choose] by making terrible choices. You have written your final chapter as a free man.'' The defendant must be resentenced if we are to remove the constitutional cloud hanging over this case.

C

For present purposes, the most important feature of the *Roper*, *Graham*, and *Miller* trilogy, and their enhanced state counterparts, *Riley* and *Casiano*, is that these cases identify and elaborate on two *different* implications of the "children are different" doctrine for the constitutional law of juvenile sentencing. One of those implications—the only one that the majority considers meaningful for eighth amendment purposes—is the forward-looking rehabilitative component, which requires the state to provide juvenile offenders "some meaningful opportunity to obtain release [i.e., parole] based on demonstrated maturity and rehabilitation."[8] *Graham* v. *Florida*, supra, 560 U.S. 75. This doctrinal strand emanates from the insight that the very hallmarks of youth that make children different also make them capable of change, because the "transitory" nature of those characteristics; *Miller* v. *Alabama*, supra, 567 U.S. 473; "enhance[s] the prospect that, as the years go by and neurological development occurs, [the juvenile

_____

[8] Although the rehabilitative strand is found in *Roper*, *Graham*, and *Miller*, the doctrinal expression of the rule is most closely associated with *Graham*, and a sentence that satisfies the requirement of parole eligibility is often referred to as "*Graham* compliant." See, e.g., *Willbanks* v. *Dept. of Corrections*, 522 S.W.3d 238, 256 (Mo.) (discussing *Riley* and its requirement of "a *Graham*-compliant sentence"), cert. denied,     U.S.     , 138 S. Ct. 304, 199 L. Ed. 2d 125 (2017).

State *v.* McCleese

offender's] deficiencies will be reformed.'' (Internal quotation marks omitted.) Id., 472, quoting *Graham* v. *Florida*, supra, 68, and *Roper* v. *Simmons*, supra, 543 U.S. 570. In the context of a case in which a juvenile offender faces a life sentence, the rehabilitative strand requires parole eligibility.

But there is a second and equally important component to the *Roper*, *Graham*, and *Miller* trilogy, which the majority ignores. This second doctrinal strand focuses on the concept of culpability or moral blameworthiness—a foundational principle in the law of crime and punishment.[9] The culpability strand, central to *Riley* and *Casiano*,[10] is based on the fundamental recognition that the age of the juvenile offender and the associated hallmarks of youth necessarily impact the assessment of moral blameworthiness at the heart of the sentencing process.[11] See *Miller* v. *Alabama*, supra, 567 U.S. 472 (explaining that ''[w]e reasoned [in *Graham*] that those [scientific] findings . . . of transient rashness, proclivity for risk, and inability to assess consequences . . . lessened a child's 'moral culpability' ''); *Graham* v. *Florida*, supra, 560 U.S. 71 (noting

---

[9] Our focus here is on punishment, but the concept of moral culpability also is fundamental to the determination of criminal liability. ''The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. *It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.*'' (Emphasis added.) *Morissette* v. *United States*, 342 U.S. 246, 250, 72 S. Ct. 240, 96 L. Ed. 288 (1952); see also R. Pound, Introduction to F. Sayre, A Selection of Cases on Criminal Law (1927), pp. xxxvi–xxxvii (''Historically, our substantive criminal law is based [on] a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.'').

[10] See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 60, 68–70; *State* v. *Riley*, supra, 315 Conn. 646–51.

[11] The cases sometimes attribute the importance of assessing culpability to generic penological goals such as retribution; see, e.g., *Miller* v. *Alabama*, supra, 567 U.S. 472; and at other times to the eighth amendment ''proportionality'' requirement. See, e.g., id., 469–71, 473.

that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender" [internal quotation marks omitted]); *Roper* v. *Simmons*, supra, 543 U.S. 571 (recognizing "the diminished culpability of juveniles").

In the same way that the rehabilitative strand relates directly to parole eligibility, the culpability strand bears directly on the *length* of the sentence imposed on a juvenile offender. Under the sentencing scheme that applied to the defendant in the present case, as in *Riley* and *Casiano*, the exact length of the sentence is determined by the judicial authority exercising its discretion, within the broad range fixed by the legislature, in the context of an adjudicatory sentencing proceeding. Many judges believe that this particular task is the single most difficult and important job that they perform in a line of work that requires them to make decisions of great consequence every day. See, e.g., *United States* v. *Brown*, 843 F.3d 74, 84 (2d Cir. 2016) (Sack, J., concurring) ("[s]entencing is perhaps the most important responsibility of a trial judge, and surely the most difficult" [internal quotation marks omitted]), cert. denied, U.S. , 138 S. Ct. 708, 199 L. Ed. 2d 579 (2018). At the core of the sentencing function is the exercise of judicial discretion to determine the appropriate sentence proportionate to the offense and the offender— a decision based in significant part on an individualized assessment of the particular defendant's culpability.

The culpability strand, for this reason, contains a crucial *procedural* component, which recognizes that the required assessment of blameworthiness only can be conducted by the sentencing court in the context of an individualized hearing. This is the procedure that was the central focus of our decision in *Casiano*. In *Casiano*, we noted that we were not bound by the federal courts' characterization of the *Miller* rule; *Casi-*

State *v.* McCleese

*ano* v. *Commissioner of Correction*, supra, 317 Conn. 63–64; and held, as a matter of state law, that *Miller* announced "a watershed rule of criminal procedure" that was retroactively applicable to cases on collateral review. Id., 62; see id., 63–64 (noting that "although this court . . . will apply the *Teague* framework, we d[o] so with the caveat that, while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis and application of *Teague*" [internal quotation marks omitted]); see also *Danforth* v. *Minnesota*, 552 U.S. 264, 280–81, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) (noting that *Teague* "was intended to limit the authority of federal courts to over-turn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own [s]tate's convictions"). As I noted previously, we explained that this procedural component could not be ignored, because "the individualized sentencing prescribed by *Miller* is central to an accurate determination . . . that the sentence imposed is a proportionate one" and "implicates . . . fundamental fairness." (Citation omitted; internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 70.

II

Against this background, the majority concludes that there is no *Miller* violation to remedy in the present case at all, because the defendant now is eligible for parole under P.A. 15-84. It does so despite three elemental points that cannot be disputed: (1) the defendant's constitutional rights were violated in 2003 when he was sentenced to eighty-five years of imprisonment without the individualized hearing required under *Miller*, as extended by *Riley*; (2) the defendant never has been resentenced since that time, which is to say that he never has been afforded a sentencing proceeding that

State *v.* McCleese

complies with the "watershed" rule deemed by this court in *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 71, to be a " 'bedrock procedural [element] essential to the fairness of a [juvenile sentencing] proceeding' " for all defendants, past and present, who remain imprisoned pursuant to a sentence imposed in violation of *Miller*; and (3) pursuant to the sentence imposed in 2003, which remains in effect, the defendant will remain in the custody of the Commissioner of Correction for a period of eighty-five years—for the remainder of his life, unless he lives past the age of 105. See P.A. 15-84, § 1, codified at General Statutes § 54-125a (g).

The majority's reasoning is flawed. Its logic begins with the false premise that the *Miller* violation evaporated as of October 1, 2015, the effective date of § 1 of P.A. 15-84, which made the defendant parole eligible. This idea is critical to the majority opinion because it serves to dispense with the need for a *Miller*-compliant resentencing; if the constitutional violation at issue is "negated" by retroactive parole eligibility, then no constitutional violation remains and there is nothing to remedy. The majority claims that its logic follows from the holding of the United States Supreme Court in *Montgomery* v. *Louisiana*, U.S. , 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016), as adopted by this court in *State* v. *Delgado*, 323 Conn. 801, 151 A.3d 345 (2016). I find this reasoning fundamentally flawed.

To begin with, neither *Montgomery* nor any other precedent of the United States Supreme Court holds or suggests that the retroactive availability of parole eligibility in any way "negates" a constitutional violation, as the majority holds today. To the contrary, *Montgomery* unequivocally held that "[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, *void*. . . . [A] court has no authority to leave in place a conviction or sentence that violates a substantive

State *v.* McCleese

rule, regardless of whether the conviction or sentence became final before the rule was announced.'' (Citation omitted; emphasis added.) *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 731. The *Montgomery* court then proclaimed: ''The [c]ourt now holds that *Miller* announced a substantive rule of constitutional law.'' Id., 736. Accordingly, the sentence imposed on the defendant in the present case became *void* under *Montgomery*. This is the very opposite of the constitutional violation being ''negated,'' as the majority would have it.

After concluding that *Miller* decided a substantive rule of constitutional law, *Montgomery* took up the remedial question necessarily triggered by the requirement of retroactive application.[12] When it opines that ''[a] [s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them''; id., 736; the statement must be read in the context of the mandatory sentencing scheme governing that case. *Montgomery* does *not* hold that the retroactive availability of parole eligibility in all cases and all circumstances will remedy a *Miller* violation; nor could it sensibly say so without eviscerating the ''substantive rule of constitutional law'' it just took pains to recognize. Id. Any suggestion to the contrary seriously misconstrues the precedent in two respects.

First, the remedial holding of *Montgomery* must be determined by reference to the facts of that case. The petitioner, Henry Montgomery, was seventeen years old at the time he committed the homicide for which he

_____

[12] It is important to understand at the outset that the court in *Montgomery* could not, as a matter of federal law, establish limitations on Connecticut's ability to provide a remedy for a *Miller* violation that is more generous than that provided by federal courts. See *Danforth* v. *Minnesota*, supra, 552 U.S. 288 (holding that ''the remedy a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of state law''). This point is discussed shortly.

State *v.* McCleese

was sentenced by a state court in Louisiana to a mandatory sentence of life imprisonment without the possibility of parole. Id., 725–26. Under Louisiana law, "[t]he sentence was automatic upon the jury's verdict, so [the petitioner] had no opportunity to present mitigation evidence to justify a less severe sentence." Id., 726. Ordering resentencing in *Montgomery*, in other words, would have been an exercise in futility because the only available sentencing option under Louisiana law was life *with* parole. See La. Code Crim. P. Ann. art. 878.1 (Supp. 2019). Given the lack of discretion in a mandatory sentencing scheme, as well as concerns of federalism and comity, the court held that, "where a juvenile offender receive[s] *mandatory* life without parole," states need not "relitigate sentences, let alone convictions, in every case . . . ." (Emphasis added.) *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. *Montgomery* is silent on the appropriate remedy for an eighth amendment violation when the juvenile offender was sentenced under a *discretionary* sentencing scheme, such as Connecticut's, in which the defendant could receive a sentence of as little as twenty-five years of imprisonment upon resentencing. See General Statutes § 53a-35a (2) (authorizing "a term not less than twenty-five years nor more than life").

The second reason that *Montgomery* exerts no controlling force here is more fundamental. It is a well established principle of federal law that "the *remedy* a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of *state* law." (Emphasis added.) *Danforth* v. *Minnesota*, supra, 552 U.S. 288. This is so because federal law is "fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of

State *v.* McCleese

new rules of constitutional law when reviewing its own [s]tate's convictions.'' Id., 280–81. For this reason, states are free—as this court did in *Casiano*—to develop ''*state* law to govern retroactivity in state postconviction proceedings''; (emphasis in original) id., 289; and those remedies may be more expansive than the remedy provided under federal law. See id., 287 (''[s]tate law may provide relief beyond the demands of federal due process, but under no circumstances may it confine petitioners to a lesser remedy'' [internal quotation marks omitted]); see also *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 107, 113, 111 A.3d 829 (2015) (recognizing that, ''under *Danforth*, state courts may give broader effect to new constitutional rules of criminal procedure than *Teague* allows in federal habeas review'' and, therefore, ''while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis''). *Danforth* also makes it clear that a state law granting its citizens broader remedies for federal constitutional violations need not be premised on ''legislation or . . . judicial interpretation of [the state] [c]onstitution''; *Danforth* v. *Minnesota*, supra, 288; rather, it may be grounded instead on the unique development of the state's law. Id., 289.

We return to the majority's determination that parole eligibility ''*negates* a *Miller* violation,''[13] such that ''there is no *Miller* violation'' at all. (Emphasis in original.) It

[13] For the sake of simplicity, I adopt the majority's use of the shorthand phrases ''*Graham* violation'' and ''*Miller* violation.'' See footnote 3 of the majority opinion. A *Graham* violation refers to a sentencing court's failure to account for the likelihood of rehabilitation by providing a juvenile offender with parole eligibility; a *Miller* violation refers to a sentencing court's failure to take into account the ''hallmarks of youth'' in determining the most appropriate term of incarceration proportional to the trial court's assessment of the offender's moral culpability and related penological objectives. *State* v. *Delgado*, supra, 323 Conn. 806 n.5.

State *v.* McCleese

is undisputed that a *Miller* violation occurred at the time the defendant's sentence was imposed in 2003 because the trial court failed to consider the mitigating factors of youth before sentencing the defendant to the harshest penalty permitted for a juvenile offender. See *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736 (holding that *Miller* "announced a substantive rule of constitutional law" because "the sentence of life without parole is disproportionate for the vast majority of juvenile offenders"); *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79 (requiring resentencing of juvenile offender because "the procedures set forth in *Miller* must be followed when considering whether to sentence a juvenile offender to fifty years imprisonment without parole"). Although the defendant now is eligible for parole after serving thirty years of his eighty-five year sentence pursuant to § 1 of P.A. 15-84, the *Miller violation* does not magically cease to exist. The majority's contrary conclusion—that parole eligibility "negates" the constitutional violation—confuses the analysis of a constitutional *violation* with the very different exercise of fashioning a *remedy* to a constitutional violation.

To support its conclusion that the *Miller* violation has been negated in this case, the majority relies on *State* v. *Delgado*, supra, 323 Conn. 811, in which this court held that a juvenile defendant who was sentenced to life imprisonment without the possibility of parole or its functional equivalent "no longer falls within the purview of *Miller, Riley*, and *Casiano*" after the passage of P.A. 15-84. The fundamental logic driving *Delgado* is straightforward: "*Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . ." Id. Three errors result from the majority's reliance on *Delgado*. First, in relying on *Delgado*, the majority incorporates and repeats that decision's failure to distinguish between the constitutional *violation* that

State *v.* McCleese

unquestionably occurred at sentencing and the constitutional *remedy* for that violation. *Delgado*, like the majority here, mistakes the question for the answer when it concludes that the constitutional violation disappeared at the moment parole eligibility became available. The question in *Delgado*, as in *Montgomery*, was whether the *Miller* violation, which had been determined to exist as a matter of substantive constitutional law, was *remedied* by the availability of parole. That question cannot be answered by wordplay—"What *Miller* violation?" Defining the violation out of existence begs the question, which remains this: Does the retroactive availability of parole eligibility remedy the constitutional violation that occurred when the trial court failed to take into account the hallmarks of youth at a compulsory individualized sentencing hearing[14] held *before imposing sentence*? This question can be answered yes or no, but it cannot be answered, as *Delgado* and the majority do, by declaring that there is no longer a constitutional violation to remedy.

Second, *Delgado* relies substantially on the remedial holding of *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736; see *State* v. *Delgado*, 323 Conn. 807–808, 812; and, to that extent, it offers no assistance in answering the specific issue confronted here, because *Delgado* neither considered nor decided the more precise state law remedial question that emerges under *Danforth*. The defendant in *Delgado* never even cited to *Danforth*, and never invoked its precedential force to argue that "the remedy a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of state law." *Danforth* v. *Minnesota*, supra,

---

[14] This individualized sentencing hearing is the proceeding that we have deemed to be essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty. *Casiano* v. *Commissioner of Correction*, supra, 716 Conn. 70–71.

State *v.* McCleese

552 U.S. 288. The closest the defendant came to making that argument in *Delgado* was the off-point contention that resentencing was contemplated by the Connecticut legislature based on its decision "to require both a *Miller* compliant sentencing hearing *and* an opportunity for parole [in P.A. 15-84] . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Delgado*, supra, 815. *Delgado* therefore neither addresses nor answers the different question raised by the defendant here, which is whether the availability of parole under P.A. 15-84 cures a constitutional violation that this court has deemed to be a "watershed" rule—that is, a rule essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty—*as a matter of state postconviction, remedial law*. Consideration of this question is essential to resolving the defendant's claim on appeal and, therefore, I address it in part II of this dissenting opinion.

Third, and relatedly, *Delgado* completely fails to acknowledge that this court went significantly further in *Riley* and *Casiano* than did the United States Supreme Court in the respective federal counterpart cases, *Miller* and *Montgomery*. *Delgado* for the most part lumps its treatment of the federal and state cases together; see *State* v. *Delgado*, supra, 323 Conn. 811–12; and it steadfastly ignores the fact that not only the holdings, but also the reasoning, of the Connecticut cases extends more broadly than that found in the federal cases in important ways. After all, *Riley* did not merely follow *Miller*, but it expressly *rejected* a "narrow" reading of the case; *State* v. *Riley*, supra, 315 Conn. 653; and expanded upon the *Miller* principles by applying them to "(1) discretionary sentencing schemes and (2) sentences that are the functional equivalent of life in addition to sentences of life without parole." *State* v. *Belcher*, Docket No. CR-94-100508, 2016 WL 2935462, *2

State *v.* McCleese

(Conn. Super. April 29, 2016) (*Devlin, J.*).[15] And *Casiano* took the *Miller* rule one step further, deeming it to be a watershed rule of criminal procedure.[16] *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69–70.

The cursory treatment *Delgado* gives this court's own cases, decided only one year earlier, is especially notable when we look more closely at the distinguishing features of *Riley* and *Casiano*. *Riley* extended the application of *Miller* beyond mandatory sentences in significant part because the court acknowledged the critical importance of *Miller*'s demand for a hearing at which the sentencing judge is "*require*[*d*] . . . to take into account how children are different" in a discretionary sentencing scheme. (Emphasis added; internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 654; see id., 658 ("*Miller* does not stand solely for the proposition that the eighth amendment demands that the sentencer have discretion to impose a lesser punishment than life without parole on a juvenile homicide offender. Rather, *Miller* logically indicates that, if a sentencing scheme permits the imposition of that punishment on a juvenile homicide offender, the trial court *must* consider the offender's 'chronological age and its hallmark features' as mitigating against such a severe sentence." [Emphasis in original.]), quoting *Miller* v. *Alabama*, supra, 567 U.S. 477. Simply put, *Riley* recognizes what *Delgado* and the majority opinion here ignore: a court cannot exercise sentencing discretion without first considering those factors deemed essential to the proper exercise of that discretion.

[15] See also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 943, remarks of Chief State's Attorney Kevin Kane (stating that "the Connecticut Supreme Court went a little farther [in *Riley*] than I ever thought the U.S. Supreme Court intended to go in *Graham* and *Miller*"); id., p. 959, remarks of former Representative Robert Farr (agreeing that *Riley* "went beyond the U.S. Supreme Court decision" in *Miller*).

[16] *Montgomery* did not reach the issue.

State *v.* McCleese

Perhaps even more troubling is that *Delgado* does not so much as mention the predominant fact that *Casiano* declares *Miller* to have established a "watershed" rule, which itself is a ruling of enormous significance. The defendant in *Delgado* once again facilitated this oversight because he offered nothing more than a conclusory argument "that '*Montgomery* does not . . . supersede the final and controlling precedent [of this court] in *Riley* and *Casiano*, which provide a new sentencing hearing as the remedy for sentences that are illegal or were imposed in an illegal manner . . . .'" *State* v. *Delgado*, supra, 323 Conn. 815. I find myself unable to stand by silently and allow *Riley* and *Casiano* to be forgotten.

II

Having determined that there was a *Miller* violation in this case, I next address whether the retroactive parole eligibility conferred by P.A. 15-84 is sufficient to cure the violation as a matter of state law.[17] In *Riley*

[17] The majority opinion criticizes the scope of my analysis on the ground that "[t]he defendant never has advanced any of the dissent's arguments," and states that the court should decline to decide this case "based on issues not raised by the parties." I disagree that the ground I cover is outside the scope of the claims raised by the defendant. The defendant argued in his initial brief that the remedial component of *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 718, is not binding on this court pursuant to *Danforth* v. *Minnesota*, supra, 552 U.S. 280–81; that resentencing is required as a matter of state law under *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 70–71, which designated *Miller* a watershed rule of criminal procedure; that the sentencing judge, not the Board of Pardons and Parole, has the constitutional obligation to sentence the defendant on the basis of an individualized assessment of the *Miller* factors; and that concerns about practicality cannot outweigh the fundamental rights at stake. After the defendant filed his initial brief, this court issued its decision in *State* v. *Delgado*, supra, 323 Conn. 801. The defendant thereafter filed a reply brief in which he argued that "[t]his court should reconsider and overrule" *Delgado* because "*Delgado* was decided when the law was in flux, without full briefing of the issues, and the decision is 'incorrect and unjust.' " To the extent that this dissenting opinion may expand on certain arguments made by the defendant, or draw out additional significance or different implications on the basis of arguments that come within the scope of the defendant's claims, I see nothing

State *v.* McCleese

and *Casiano*, this court adopted and expanded on the principle that "children are different" for the purposes of criminal sentencing. (Internal quotation marks omitted.) *Casiano* v. *Commissioner*, supra, 317 Conn. 60; *State* v. *Riley*, supra, 315 Conn. 654. The assessment of culpability conducted as part of a criminal sentencing is a central aspect of the "children are different" jurisprudence elucidated in *Riley* and *Casiano*. These cases understand that young people who commit crimes, even horrible crimes, cannot reflexively be written off as bad and immoral people of defective character. Their conduct may be despicable, and even unforgiveable, and the harm they cause may be irrevocable, but, in the context of juvenile offenders, our case law requires the sentencing authority to resist the reflexive assignment of unmitigated moral blameworthiness that may be directed at adults who commit the same crimes. Our

improper or unusual about doing so. Cf. *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 635 n.7, 126 A.3d 558 (2015) (distinguishing between "claim[s]" and "argument[s]" and noting that appellate courts may review "legal arguments that . . . are subsumed within or intertwined with arguments related to the legal claim" [internal quotation marks omitted]).

Finally, because I would conclude that the parole eligibility conferred by P.A. 15-84 was not intended to remedy the violation of juvenile offenders' constitutional rights at sentencing pursuant to *Miller*, I do not address the question of whether the legislature can, without violating the separation of powers enshrined in article second of the state constitution, modify a defendant's sentence to remedy a *Miller* violation. It is an open question whether the legislature would transgress constitutional limitations were P.A. 15-84 construed to either (1) delegate to the Board of Pardons and Paroles, an agency wholly outside of the Judicial Branch, the authority to exercise an act of sentencing discretion already conferred to the Judicial Branch, or (2) preempt the judiciary from requiring resentencing to remedy a constitutional violation committed by a judicial officer exercising his judicial discretion in a judicial proceeding. See Conn. Const., art. II ("[t]he powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another"). I do not read the majority's separation of powers discussion to address these particular points, because its view, following *Delgado*, is that parole eligibility *negates* the *Miller* violation, thus making resentencing unnecessary.

452 OCTOBER, 2019 333 Conn. 378

State *v.* McCleese

growing knowledge about adolescent development no longer permits us to say that the juvenile offender is exercising his free will to the same extent as an adult offender.[18] See generally S. Erickson, "Blaming the Brain," 11 Minn. J.L. Sci. & Tech. 27, 28–29 (2010) ("Much of the recent legal scholarship concerned with criminal responsibility as of late has invested heavily in the notion that the findings of biological sciences promise a fundamental shift away from orthodox notions of criminal liability. . . . All share the belief that the impact of neuroscience on the law in the coming years will be inevitable, dramatic, and will fundamentally alter the way the law does business. And nowhere is this promise endorsed with more gusto than in discussions of responsibility and criminal liability." [Footnotes omitted.]).

*Riley*, applying the logic of *Miller* and the science underlying its holding, identifies with precision the hallmark features of youth that must be considered by a judge in mitigation at any sentencing proceeding at which the judge may sentence a juvenile offender to life without parole. Those features include "immaturity, impetuosity, and failure to appreciate risks and consequences; the offender's family and home environment and the offender's inability to extricate himself from that environment; the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him; the offender's inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation . . . ." (Internal quotation marks omitted.) *State* v. *Riley*,

---

[18] Teenage children unquestionably are capable of making moral choices and conform their conduct accordingly. We are speaking about matters of degree. The physiological and psychological impediments at issue, moreover, are not distributed in equal shares to all juveniles.

State *v.* McCleese

supra, 315 Conn. 658. *Casiano*, decided very shortly
thereafter, instructs that the adjudicative process by
which the judicial authority gives individualized consid-
eration to these factors as part of the discretionary act
of sentencing is fundamental to our system of justice.
*Casiano* v. *Commissioner of Correction*, supra, 317
Conn. at 69–71.

As acknowledged in *Miller* and repeated in *Casiano*,
"upon proper consideration of 'children's diminished
culpability' . . . it would be 'uncommon' for a sentenc-
ing authority to impose the harsh penalty of a life sen-
tence without parole." Id., 70, quoting *Miller* v. *Ala-
bama*, supra, 567 U.S. 479. These cases, "in effect, set
forth a presumption that a juvenile offender would not
receive a life sentence without parole upon due consid-
eration of the mitigating factors of youth . . . ." *Casi-
ano* v. *Commissioner of Correction*, supra, 317 Conn.
70. Thus, "the individualized sentencing prescribed by
*Miller*" necessarily "impact[s] the sentence imposed in
most cases." Id.

In the present case, the defendant's eighty-five year
sentence of imprisonment is presumptively dispropor-
tionate to his moral culpability because, if the trial court
had considered the mitigating factors of the defendant's
youth at the time of his commission of the offenses, as
*Miller* requires, a lesser sentence likely would have
been imposed. We do not know what that sentence
would have been, of course, because the constitutional
violation that occurred at the time deprives us of that
knowledge. The majority opinion necessarily assumes
that, if the constitutional requirements had been fol-
lowed, the sentence would have been eighty-five years
*with* the possibility of parole. Or, at least, it finds the
use of such an assumption sufficient for remedial pur-
poses, so that the retroactive availability of parole elimi-
nates the need for a resentencing that complies with

State *v.* McCleese

the requirements set forth in *Miller*, *Riley*, and *Casiano*. My disagreement with this approach exists on many levels, but it will be useful to express my disagreement in two parts. The first, addressed in part II A of this dissenting opinion, focuses on the particular ways that the parole eligibility conferred by § 1 of P.A. 15-84 is insufficient to remedy the disproportionate length of the defendant's sentence, and the second, addressed in part II B of this dissenting opinion, focuses on what I consider to be the fundamental conceptual flaws in the majority's position.

A

Providing parole eligibility is insufficient to remedy the disproportionate length of the defendant's sentence for four reasons. First, parole eligibility is dependent on the length of the sentence imposed, and, here, the defendant's lengthy sentence means that he is not eligible for parole until after he has served a minimum of thirty years of imprisonment. See P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (1) (B) (providing that "person . . . serving a sentence of more than fifty years" is not eligible for parole until "after serving thirty years"). If the defendant had been sentenced to a term of anything less than fifty years, he would be eligible for parole sooner—"after serving sixty per cent of the sentence or twelve years, whichever is greater." P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (1) (A). Second, once a defendant becomes eligible for parole, release is by no means guaranteed, because "the decision to grant parole is entirely within the discretion of the [Board of Pardons and Paroles]." (Internal quotation marks omitted.) *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 371, 163 A.3d 597 (2017). This leads to my third point, which is that the length of a defendant's sentence affects the likelihood that parole

State *v.* McCleese

will be granted.[19] As the defendant points out, "an inmate serving an eighty-five year sentence will fare significantly worse [at a parole hearing] than other inmates who, for example, are serving fifty year sentences for committing similar, serious (homicide) offenses. Common sense would tell us that the greater the reduction requested, the less likely it would be that an inmate would receive relief at a parole hearing." Finally, once a person is released on parole, he or she nonetheless "remain[s] in the custody of the Commissioner of Correction and [is] subject to supervision by personnel of the Department of Correction during such person's period of parole." P.A. 15-84, § 1, codified at General Statutes § 54-125a (g). Thus, neither parole eligibility nor release on parole cures the violation of the defendant's eighth amendment right to be free from cruel and unusual punishment.

Although other states have enacted statutes or regulations to remedy *Miller* violations by providing for retroactive parole eligibility, many of these states expressly require the decision-making authority to consider a juvenile offender's diminished culpability at the time of the commission of the offense in deciding whether to grant parole. See Ark. Code Ann. § 16-93-621 (b) (2) (Supp. 2017) (requiring parole board to take into consideration, inter alia, "[t]he diminished culpability of minors as compared to that of adults," "[t]he hallmark features of youth," "[a]ge of the person at the time of the offense," and "[i]mmaturity of the person at the time of the offense"); Cal. Penal Code § 3051 (f) (1) (Deering Supp. 2018) (requiring parole board to "take

---

[19] The length of a defendant's sentence also affects an inmate's classification, which is used to "determine the inmate's appropriate confinement location, treatment, programs and employment assignment whether in a facility or the community." (Internal quotation marks omitted.) *Anthony A.* v. *Commissioner of Correction*, 326 Conn. 668, 671–72 and n.3, 166 A.3d 614 (2017), quoting Department of Correction, Administrative Directive 9.2 (3) (a) (effective July 1, 2006).

State *v.* McCleese

into consideration the diminished culpability of youth
as compared to that of adults'' and ''the hallmark fea-
tures of youth''); W. Va. Code Ann. § 62-12-13b (b) (Lex-
isNexis Supp. 2018) (requiring parole board to consider
''[a]ge at the time of the offense,'' ''[i]mmaturity at the
time of the offense,'' and ''[h]ome and community envi-
ronment at the time of the offense''); Md. Code Regs.
§ 12.08.01.18 (3) (2016) (requiring parole commission
to consider ''[a]ge at the time the crime was committed,''
''[t]he individual's level of maturity and sense of respon-
sibility at the time . . . the crime was committed,''
''[w]hether influence or pressure from other individuals
contributed to the commission of the crime,'' ''[t]he
home environment and family relationships at the time
the crime was committed,'' ''[t]he individual's educa-
tional background and achievement at the time the
crime was committed,'' and ''[o]ther factors or circum-
stances unique to prisoners who committed crimes at
the time the individual was a juvenile that the Commis-
sioner determines to be relevant''). For example, in
*People* v. *Franklin*, 63 Cal. 4th 261, 370 P.3d 1053, 202
Cal. Rptr. 3d 496 (2016), the Supreme Court of California
found parole eligibility under Cal. Penal Code § 3051
(f) (1) to be an adequate remedy for a *Miller* violation
because, amongst other things, the statute directed ''the
[b]oard to give great weight to the diminished culpabil-
ity of juveniles as compared to adults, the hallmark
features of youth, and any subsequent growth and
increased maturity of the prisoner . . . [and] contem-
plate[d] that information regarding the juvenile offend-
er's characteristics and circumstances at the time of
the offense will be available at a youth offender parole
hearing to facilitate the [b]oard's consideration.'' (Cita-
tion omitted; internal quotation marks omitted.) Id., 283.

In contrast, P.A. 15-84 neither requires the Board of
Pardons and Paroles (board) to give any special weight
to the *Miller* factors and the diminished culpability of

State *v.* McCleese

juvenile offenders, nor contemplates that such information will be available at a youth offender parole hearing to facilitate the board's decision.[20] Although the board may grant a juvenile offender parole if it finds that "such person has demonstrated substantial rehabilitation since the date such crimes or crimes were committed considering such person's character, background and history, as demonstrated by . . . the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime . . . [and] such person's efforts to overcome . . . obstacles that such person may have faced as a child"; P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (4) (C); this provision plainly is focused on a juvenile offender's rehabilitation, rather than a juvenile offender's diminished culpability. Parole eligibility under P.A. 15-84, in other words, is "future focused" and does not consider whether a juvenile offender "was less blameworthy due to their youth at the time of the offense." *State* v. *Link*, 297 Or. App. 126, 151, 441 P.3d 664 (2019); see id., 149–52 (holding that murder review hearing under Or. Rev. Stat. § 163.105 [2015] after thirty years of imprisonment did not "[provide] an opportunity for the consideration of the qualities of youth sufficient to comply with *Miller*" because [1] "*Graham* and *Miller* are replete with language holding that the proper actor to consider the qualities of youth is the *sentencer*," [2] "any consideration of the qualities of youth would come—at a

---

[20] The majority opinion points out that the board has explained in an annual report that it gives " 'great weight to the diminished culpabilities of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity that has been displayed when considering an offender for suitability.' " See footnote 12 of the majority opinion. This statement carries no legal force, of course, because the directive is not contained in any administrative regulation or in P.A. 15-84. In any event, parole eligibility is not an adequate substitute for a *Miller*-compliant resentencing by a judge.

State *v.* McCleese

minimum—[thirty] years after the imposition of the sentence'' and ''delay would undercut the essence of *Miller*,'' and [3] parole board is required to consider neither ''immaturity at the time of the offense, nor how such immaturity lessened the culpability or blameworthiness of the defendant'' [emphasis in original]). Because nothing in P.A. 15-84 requires the board to consider the *Miller* factors when deciding whether a juvenile offender will spend the rest of his natural life in prison, I believe that parole eligibility under the statute is inadequate to remedy the violation of a juvenile offender's eighth amendment rights. See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 70 (''the individualized sentencing prescribed by *Miller* is central to an accurate determination . . . that the sentence imposed is a proportionate one'' [citation omitted; internal quotation marks omitted]); *State* v. *Riley*, supra, 315 Conn. 653 (holding that, under *Miller*, ''the sentencer must consider age related evidence as mitigation when deciding whether to irrevocably sentence juvenile offenders to a lifetime in prison'').

The inadequacy and unfairness of the retroactive aspect of P.A. 15-84, as applied to the defendant and any similarly situated juvenile offenders, is exacerbated by the disparate impact that *Miller* violations have on minority juvenile offenders. In written testimony submitted to the Joint Standing Committee on the Judiciary, the Center for Children's Advocacy explained that, ''[e]ven though [b]lack and Latino youth comprise only 16% of Connecticut's total population, they represent 88% [of] all juvenile offenders serving sentences of more than [ten] years and 92% of youth sentenced to more than [fifty] years. Additionally, [b]lack and Latino youth serve longer sentences than when convicted of the same crime as their white counterparts.'' Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1048. Moreover, prior to the enactment of P.A.

State *v.* McCleese

15-84, "100% of juveniles serving a life sentence without parole [were] African Americans . . . ." Id., p. 1097, remarks of Subira Gordon, legislative analyst for the African American Affairs Commission. Thus, in Connecticut, it is minority youth who primarily are affected by the disproportionately long sentences meted out in violation of the requirements of *Miller*, and it is minority youth who continue to suffer the unconstitutional effects of these disproportionately long sentences.

The defendant in the present case was seventeen years old at the time of the commission of his crimes, and, under federal and Connecticut precedent, he has an eighth amendment right to have the mitigating factors of his youth, and his consequent diminished moral culpability, considered in determining whether he should spend the rest of his natural life imprisoned. Despite this constitutional right, the defendant has not had— and, under P.A. 15-84, never will have—an adjudicatory proceeding in which his diminished moral culpability is considered in relation to the length of his sentence. Because the parole eligibility conferred by P.A. 15-84 does not ensure "an accurate determination that the sentence imposed is a proportionate one"; *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69; it fails to remedy the violation of the defendant's fundamental constitutional rights.[21]

B

I have five broader points to make in response to the suggestion that the constitutional violation that

[21] The violation that I would find occurred in this case likely would carry implications for a relatively small number of similarly situated juvenile offenders. As of March, 2015, there were "approximately 200 people [in Connecticut] serving sentences of more than [twelve] years for crimes committed under the age of [eighteen]. About [fifty] are serving [fifty] years or more." Conn. Joint Standing Committee Hearings, supra, p. 953, remarks of Professor Sarah F. Russell. The record does not disclose how many of these individuals are serving sentences imposed after sentencing hearings that did not comply with *Miller*.

State *v.* McCleese

occurred at the defendant's sentencing in June, 2003, is erased or cured by the legislature's provision of parole eligibility in 2015.

First, to repeat in the most basic terms what already has been said, it seems patently obvious that curing the *Graham* violation that occurred here does not address or cure the *Miller* violation that also occurred, because *Graham* and *Miller* concern two different aspects of the defendant's punishment. As I previously discussed, parole eligibility addresses the offender's potential for change and rehabilitation based on the scientific fact that the hallmarks of youth usually are transitory and will disappear over time. The individualized sentencing hearing mandated by *Miller* is necessary to take into account the hallmarks of youth as they relate to the offender's culpability, not his prospects for future rehabilitation, for purposes of deciding whether the defendant should be sentenced to thirty years, fifty years, or some other term of imprisonment. To suggest that parole eligibility erases or cures the *Miller* violation in a discretionary sentencing scheme strikes me as irrational when there is a distinct violation—one of watershed dimensions—that has independent consequences on the *length* of the sentence.

Second, unless it is willing to heighten the irrationality still more, the majority cannot brush aside the *Miller* violation inflicted on the defendant in 2003 on the theory that the violation disappears as a definitional matter because *Miller, Riley*, and *Casiano* apply only to sentences of life *without* parole, and the defendant is now serving a sentence of life *with* parole. To begin with, as a legal matter, the defendant is serving the very *same* sentence of eighty-five years of imprisonment that was imposed in 2003. Parole eligibility is not part of a defendant's sentence and, therefore, cannot cure a constitutional infirmity in the sentence. Parole eligibility, like other terms and conditions affecting how an inmate's

State *v.* McCleese

sentence is implemented by the Department of Correction, is not within the jurisdiction of the sentencing judge or the Judicial Branch. See, e.g., *State* v. *McCoy*, 331 Conn. 561, 586–87, 206 A.3d 725 (2019) (clarifying and reiterating that "a trial court loses jurisdiction once the defendant's sentence is executed, unless there is a constitutional or legislative grant of authority"); *Perez* v. *Commissioner of Correction*, supra, 326 Conn. 371 (noting that "the decision to grant parole is entirely within the discretion of the board" and, therefore, "parole eligibility under [General Statutes] § 54-125a does not constitute a cognizable liberty interest sufficient to invoke habeas jurisdiction" [internal quotation marks omitted]). If the sentence itself was illegal, it remains illegal, because it has not changed. That point is technical, although we often rely on technical points to reach our holdings in the field of criminal sentencing.

More fundamentally, it is remarkable to me that the majority is willing, with no apparent hesitation, to conclude that the entire corpus of juvenile sentencing law developed over the past fifteen years based on the revolutionary, paradigm-shifting insight that " 'children are different' " for sentencing purposes; *Casiano* v. *Commissioner*, supra, 317 Conn. 60; *State* v. *Riley*, supra, 315 Conn. 654; can be reduced to nothing more than the anemic requirement of parole eligibility.[22] It is not impossible to read the cases so narrowly, I suppose, but to arrive at that conclusion fights fiercely against the logic of those cases and the spirit animating them, especially as seen in *Riley* and *Casiano*. In my view, it is impossible to read our precedent to suggest that the foundational, animating, and essential principle of those cases is inapplicable to any sentence other than death or life without the possibility of parole. The pro-

[22] I say "anemic" because such a narrow reading leaves us virtually alone, among all countries in the world, in the severity of our juvenile sentencing jurisprudence. See footnote 3 of this dissenting opinion.

State *v.* McCleese

foundly significant principle that " 'children are constitutionally different from adults for sentencing purposes,' " embraced enthusiastically by this court in 2015; *Casiano* v. *Commissioner of Correction*, supra, 56; has been reduced to this disheartening reformulation: "Children are constitutionally the same as adults for sentencing purposes, even for the most severe sentences, short of death and its functional equivalent." The result is unfortunate and unnecessary. It also signals a major retreat from where our court positioned itself on the issue only four years ago, which brings us back to *Casiano*.

Third, the majority, in my view, vastly overstates the significance of the unremarkable fact that the legislature made the sentencing provisions contained in § 2 of P.A. 15-84 prospective, while giving the parole provisions in § 1 of P.A. 15-84 retroactive application. It is wholly unnecessary to read a preemptive remedial intention into that arrangement, and the fact that the legislature did not make § 2 retroactive across the board does not mean that it intended to strip judges of the authority to order resentencing on a case-by-case basis in the event that the juvenile offender was sentenced in violation of *Miller*. It would have made no sense to require resentencing in every case for the simple reason that some significant number of juvenile offenders within the retroactive scope of P.A. 15-84 would have been sentenced by trial judges who had taken into account the hallmarks of youth prior to 2015. The scientific basis for mandating—indeed, constitutionalizing—that procedure may not yet have been widely known before *Miller*, but many judges with sentencing responsibility undoubtedly were aware that children often lack adult-like judgment and impulse control, and these considerations were treated as a mitigating factor by some judges long prior to 2015. See *Roper* v. *Simmons*, supra, 543 U.S. 569 (noting that lack of maturity and underde-

State *v.* McCleese

veloped sense of responsibility found in youth is some-
thing "any parent knows"). Requiring resentencing in
every case would not have been sensible, and it is hardly
surprising that the legislature did not include a generic
retroactivity provision in § 2 of P.A. 15-84.[23]

Fourth, the majority's claim that the passage of time
makes resentencing not "practical" only serves to rein-
force the impression that we have lost the courage of
the convictions that we expressed in *Casiano*, in which
we deemed the constitutional violation that occurred
at the defendant's sentencing in 2003 a transgression
of the most fundamental principles of individualized
justice. *Casiano* v. *Commissioner of Correction*, supra,
317 Conn. 69–70. It strikes me as very odd that we so
easily can shrug our shoulders now and say that "no
remedy will put the defendant in the same position he
would have been in if his youth had been considered
when he was sentenced," and so we need not even
try. Given the passage of time since the defendant's
commission of the crimes in 2001, it is possible that
some practical difficulties may arise during the resen-
tencing process, but I cannot agree that this possibility
relieves us of our obligation to provide a meaningful
remedy for the constitutional violation that occurred

[23] Based on the chronology of events, it appears exceedingly unlikely
that the legislature was aware of this court's decision in *Casiano* and its
designation of *Miller* as a watershed rule of criminal procedure at the time
P.A. 15-84 was enacted. The *Casiano* decision officially was released on
May 26, 2015, the very same day that the House of Representatives passed
the final version of the bill that became P.A. 15-84. See 58 H.R. Proc., Pt.
15, 2015 Sess., p. 4917. The Senate had passed the bill over a month earlier,
on April 22, 2015. See 58 S. Proc., Pt. 3, 2015 Sess., p. 734. It was required
to vote again, on May 29, 2015, because the House had adopted a minor
amendment to the bill immaterial to the present appeal. See 58 S. Proc., Pt.
8, 2015, p. 2646; see also 58 H.R. Proc., supra, p. 4910 (summarizing Senate
Amendment Schedule "A"). The transcript of the proceedings demonstrates
that the May 29 Senate vote was little more than a formality—there was no
further discussion of the merits of the bill and certainly no mention of the
newly released *Casiano* decision.

State *v.* McCleese

at sentencing. "Constitutional violations implicating the courts must be susceptible of a judicial remedy." *Pamela B.* v. *Ment*, 244 Conn. 296, 313, 709 A.2d 1089 (1998). "Once a constitutional violation is found," a court is required to fashion a "remedy to fit the nature and extent of the constitutional violation." (Internal quotation marks omitted.) *Dayton Board of Education* v. *Brinkman*, 433 U.S. 406, 420, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977).

The reality is that the resentencing of convicted offenders is neither a rare nor impractical remedy in numerous judicial contexts. At the federal level, tens of thousands of resentencing proceedings have been required over the past few years in the wake of various retroactive judicial rulings and sentencing reforms.[24]

[24] For example, in 2014, the United States Sentencing Commission promulgated Amendment 782, commonly known as the "drugs-minus-two" amendment, which was retroactively applicable to criminal defendants convicted of certain drug offenses and resulted in "approximately 40,000 federal prisoners eligible to seek shorter sentences." J. Haile, "Farewell, Fair Cruelty: An Argument For Retroactive Relief in Federal Sentencing," 47 U. Tol. L. Rev. 635, 640 (2016). As a result of Amendment 782, "approximately 30,000 individuals had their sentences reduced, with an average decrease of [twenty-five] months." C. Devins, "Lessons Learned From Retroactive Resentencing After *Johnson* and Amendment 782," 10 Fed. Cts. L. Rev. 39, 45 (2018). More recently, in *United States* v. *Johnson*, U.S. , 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), the United States Supreme Court held that the residual clause definition of a "violent felony" in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924 (e) (2) (B), was unconstitutionally vague, resulting in a 334 percent increase in the filing of motions to vacate, set aside or correct sentences under 28 U.S.C. § 2255, and a 312 percent increase in the filing of "second or successive collateral challenges under 28 U.S.C. § 2244" in the federal courts. C. Devins, supra, 10 Fed. Cts. L. Rev. 54–55. Pursuant to *Johnson* and *Welch* v. *United States*, U.S. , 136 S. Ct. 1257, 1265, 194 L. Ed. 2d 387 (2016) (holding that *Johnson* was "a substantive decision and so has retroactive effect . . . in cases on collateral review"), criminal defendants "eligible for relief [are] entitled to resentencing without the ACCA's residual clause." C. Devins, supra, 10 Fed. Cts. L. Rev. 87. "Although the Sentencing Commission estimates that *Johnson* resulted in sentence reductions for [only] about 1,200 inmates nationwide, these cases are likely underreported and . . . the actual number could be much higher." (Footnote omitted.) Id., 80.

State *v.* McCleese

This remedial practice is by no means new; there have been watershed-like events in criminal procedure over the years requiring resentencing of offenders on a far more extensive scale than implicated here. See, e.g., W. Kelly, "Sentencing, Due Process, and Invalid Prior Convictions: The Aftermath of *United States* v. *Tucker*," 77 Colum. L. Rev. 1099 (1977) (discussing federal resentencings required in wake of *United States* v. *Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 [1972], which held that sentences cannot be enhanced by convictions obtained in violation of right to counsel under *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 [1963]). In Connecticut, resentencing is necessary in various contexts as well, including in habeas cases involving a successful claim of ineffective assistance of counsel, in which resentencing is required to "place the habeas petitioner, as nearly as possible, in the position that he would have been in if there had been no violation of his right to counsel." (Internal quotation marks omitted.) *H. P. T.* v. *Commissioner of Correction*, 310 Conn. 606, 615, 79 A.3d 54 (2013). It makes no sense to me that we find ourselves working so hard to make this remedy unavailable in the present context involving the constitutional rights of children.

Fashioning remedies for constitutional violations sometimes presents courts with a "difficult task," but a meaningful remedy "is what the [c]onstitution and our cases call for, and that is what must be done in this case." *Dayton Board of Education* v. *Brinkman*, supra, 433 U.S. 420; see also *State* v. *Lyle*, 854 N.W.2d 378, 403 (Iowa 2014) (recognizing that resentencing juvenile offenders "will likely impose administrative and other burdens," but holding that those are "burdens our legal system is required to assume [because] [i]ndividual rights are not just recognized when convenient"). The Supreme Court of Iowa relied on this sound reasoning in a similar case and, in my view, its analysis should

State *v.* McCleese

apply to a rule that we have deemed to constitute a
"watershed rule" under Connecticut law: "Even if the
resentencing does not alter the sentence for most juve-
niles, or any juvenile, the action taken by our [trial
court] judges in each case will honor the decency and
humanity embedded within [the state constitution] and,
in turn, within every [citizen of the state]. The youth
of this state will be better served when judges have
been permitted to carefully consider all of the circum-
stances of each case to craft an appropriate sentence
and give each juvenile the individual sentencing atten-
tion they deserve . . . . The [s]tate will be better
served as well." *State* v. *Lyle*, supra, 403.

Fifth, and finally, if the majority means what it says
here, then it should acknowledge that we really did not
mean what we said in *Casiano* when we deemed *Miller*
to establish a watershed rule of constitutional dimen-
sion. The language we employed in *Casiano* qualifies
as more than a begrudging acceptance, more than a
mild endorsement, more even than a firm embrace; it
elevates the principle to the most revered constitutional
status available. Indeed, the *Casiano* watershed desig-
nation confers constitutional status with meaning
beyond the eighth amendment, because it triggers due
process protection. The reason that a procedural rule
of watershed significance requires retroactive applica-
tion is that the right is deemed to be "implicit in the
concept of ordered liberty," which is the touchstone
used to identify rights entitled to protection as a matter
of constitutional due process. (Internal quotation marks
omitted.) *Albright* v. *Oliver*, 510 U.S. 266, 301, 114 S.
Ct. 807, 127 L. Ed. 2d 114 (1994) (Stevens, J., dissenting);
see id. (explaining that court initially held that "the
right to be free from unreasonable official searches
was 'implicit in "the concept of ordered liberty,"'" and
therefore protected by the [d]ue [p]rocess [c]lause of
the [f]ourteenth [a]mendment," and that court later

333 Conn. 378 OCTOBER, 2019 467

State *v.* McCleese

" 'extend[ed] [those] *substantive* protections of due process to all constitutionally unreasonable searches— state or federal' " [emphasis in original]); *Herrera* v. *Collins*, 506 U.S. 390, 435–36, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) ("This [c]ourt has held that the [d]ue [p]rocess [c]lause protects individuals against two types of government action. So-called substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty . . . . When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . . This requirement has traditionally been referred to as procedural due process." [Citations omitted; internal quotation marks omitted.]); *Palko* v. *Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 (1937) (equating rights that are "the very essence of a scheme of ordered liberty" with " 'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' ").[25]

The *Casiano* watershed designation and its constitutional entailments cannot be ignored; nor can it be suggested with a straight face that the procedural right to an individualized hearing before the sentencing court is owed the most robust constitutional protection available when a juvenile offender is sentenced to life in prison without parole, but suddenly warrants no constitutional protection at all if the offender receives an identical sentence with the possibility of parole.

I therefore dissent.

---

[25] See T. Darden, "Constitutionally Different: A Child's Right to Substantive Due Process," 50 Loy. U. Chi. L.J. 211, 267–68 (2018) ("[a] permeating substantive due process right based on age status and its attendant disadvantages in achieving fundamental fairness at certain stages of the justice process seems aligned with fully interpreting the juvenile sentencing cases").